**Cherrye BRADLEY, et al.,**
**Plaintiffs–Appellants,**

v.

**Pickens BROWN, et al., Defendants–**
**Appellees.**

**No. 94–2467.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1994.

Decided Dec. 13, 1994.

---

Kenneth E. Nowak, Thom W. Kramer (argued), Buoscio, Pera, Kramer & Nowak, Merrillville, IN, for Pickens Brown, Kill Co.

Before COFFEY, PRATT,* and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Plaintiffs Frances Roy and Cherrye Bradley, along with two others, instituted this diversity action seeking recovery from The Kill Company, a sole proprietorship operated by the defendant Pickens Brown ("Brown"). The plaintiffs allege that Brown negligently applied pesticides at their place of employment, causing their injuries, including respiratory and other physiological problems. During a bench trial, the district court excluded the plaintiffs' expert testimony of two physicians on the subject of Multiple Chemical Sensitivity ("MCS") disorder. After the trial, in which the court ruled in favor of the plaintiffs but only awarded them a small amount of damages, Roy and Bradley appealed, arguing that the court erred in excluding the expert testimony. The plaintiffs contend that this improper exclusion significantly affected the court's determination of the extent of their damages. We now affirm the judgment of the district court.

## I.

The Kill Company, owned by Brown, was an insect extermination company that frequently contracted with United States Steel ("USX") to apply pesticides at USX's Gary Works Plant ("plant"). Responding to an internal complaint by USX's employees about insect bites, and a request by USX to eliminate this insect problem, on April 20, 1983 between 6:00 a.m. and 6:30 a.m. Brown fumigated the file room of the Accounts Payable Building at the plant. Brown sealed the file room and fogged it using Pyrtox, a pesticide composed primarily of pyrethins and mineral oil in a kerosene base. Believing that the rooms would be ventilated after he sprayed the pesticides, Brown left the area after completing the chemical spraying pro-

Terrence L. Smith (argued), Julie R. Fouts, Smith & Debonis, East Chicago, IN, for Cherrye L. Bradley, Frances Roy.

* The Honorable George C. Pratt, of the United States Court of Appeals for the Second Circuit, sitting by designation.

cess. Unfortunately, the Pyrtox-filled air was not ventilated. Instead, the ventilation system recirculated the air in the Accounts Payable Building and spread, rather than removed, the Pyrtox fog.

USX employees arrived at work in the building after 7:00 a.m. Roy, soon after entering her office, began to feel sick. She became nauseated, her chest became hot, her eyes watered, and she ultimately blacked out. Bradley, who arrived at the building around 8:00 a.m., saw Roy and a small crowd of people standing outside. At the direction of a union "grievance person," Bradley entered the room and sat at her desk. She eventually was instructed to leave. She also felt nauseous and vomited both in an ambulance and at the USX health dispensary. In total, thirty-three people, including Roy and Bradley, were taken by ambulance from the Accounts Payable Building to the USX health clinic for treatment.

Roy, Bradley, and two others filed suit on February 8, 1985, in the United States District Court for the Northern District of Illinois. On September 27, 1985, the action was transferred to the Northern District of Indiana where a bench trial was held on November 29, 30 and December 1, 1993. During the trial, the plaintiffs attempted to show that they were suffering from MCS, a health condition allegedly arising out of their April 20, 1983 exposure to Pyrtox.[1] To make this showing, the plaintiffs sought to introduce the testimony of two doctors specializing in the field of clinical ecology, Dr. William J. Rea and Dr. Alfred R. Johnson. The plaintiffs first contended that the doctors would have provided expert testimony on MCS and its cause. Brown made a motion *in limine* to exclude the doctors' testimony. The district court granted the motion on the basis that the opinions regarding the causes of Roy and Bradley's MCS lacked sufficient scientific basis. *Bradley v. Brown,* 852

F.Supp. 690 (N.D.Ind.1994).[2] Roy and Bradley appeal this decision.

## II.

Roy and Bradley argue that the district court improperly excluded the testimony of Drs. Rea and Johnson. During the trial, the plaintiffs attempted to admit into evidence the depositions of these doctors. Brown moved *in limine* to exclude Rea's deposition and the portions of Johnson's deposition concerning MCS. Brown did not challenge the professional qualifications of either doctor; rather, he contested whether Drs. Rea and Johnson's testimony about MCS was based upon scientific knowledge and therefore helpful to the court.

It is well established that issues related to expert opinion testimony are matters of law to be determined by the trial judge. *Cella v. United States,* 998 F.2d 418, 422 (7th Cir.1993); *Wallace v. Mulholland,* 957 F.2d 333, 336 (7th Cir.1992); *see* Fed. R.Evid. 104(a) ("[p]reliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court, subject to the provisions of subdivision (b)"). Specifically, matters relating to the admissibility of scientific evidence and expert testimony are governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.1994), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *Porter v. Whitehall Laboratories, Inc.,* 9 F.3d 607, 612 (7th Cir.1993). We first undertake a *de novo* review of whether the district court properly followed the framework set forth in *Daubert. See Mars v. United States,* 25 F.3d 1383, 1383–84 (7th Cir.1994). Provided the district court adhered to *Daubert*'s parameters, we will not disturb the district court's findings unless

---

**1.** MCS is a multi-symptom disorder which can be caused by exposure to chemical or environmental incitants. MCS results in a hyper-sensitivity to what would normally be acceptable doses of chemicals. MCS's symptoms can include respiratory irritation, shortness of breath, fatigue and nausea.

**2.** Roy and Bradley also argue that the district court failed to make findings of fact and conclusions of law pertaining to Dr. Rea's testimony as it related to Roy's medical conditions other than MCS. We reject this contention in that the district court's opinion adequately addressed the plaintiffs' claims. Furthermore, the district court's findings were not clearly erroneous.

they are manifestly erroneous. *Cella*, 998 F.2d at 423 ("the admission or exclusion of expert testimony ... will generally not be disturbed unless it is manifestly erroneous"); *accord Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 500–01 (9th Cir.1994), ("[w]e review *de novo* the district court's interpretation of the Federal Rules of Evidence and will uphold its decision to exclude expert testimony unless it is 'manifestly erroneous'") (citations omitted); *United States v. Daccarett*, 6 F.3d 37, 58 (2d Cir.1993) ("[a] decision to allow expert testimony is within the broad discretion of the trial judge and 'is to be sustained on appeal unless manifestly erroneous'") (citation omitted), *cert. denied*, — U.S. ——, ——, ——, 114 S.Ct. 1294, 1295, 1538, 127 L.Ed.2d 648, 128 L.Ed.2d 190 (1994).

■ *Daubert* established the standard for determining the admissibility of scientific evidence. In *Daubert*, the Supreme Court concluded that the test for the admissibility of scientific evidence enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), had been superseded by the Federal Rules of Evidence.[3] The Court determined that Rule 702[4] anticipated "some degree of regulation of the subjects and theories about which an expert may testify." *Daubert*, — U.S. at ——, 113 S.Ct. at 2795; *O'Conner*, 13 F.3d at 1106; *Porter*, 9 F.3d at 613. Rule 702 explicitly requires that the testimony "assist the trier of fact to understand or determine a fact in issue." Fed.R.Evid. 702. This 'helpfulness' standard "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility" *Daubert*, — U.S. at ——, 113 S.Ct. at 2796. District court judges have significant responsibility in de-

termining whether expert testimony is relevant and helpful.

To aid the court in making the admissibility determination, *Daubert* established a framework to ensure the reliability of the methodology utilized by the particular field of science. *O'Conner*, 13 F.3d at 1106; *Porter*, 9 F.3d at 613, 617. In *Daubert*, the Supreme Court noted several factors the trial court should take into consideration when making this evaluation: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the "general acceptance"[5] of the theory. *Daubert*, — U.S. at —— - ——, 113 S.Ct. at 2796–97. The Court, in summary, concluded:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert*, — U.S. at ——, 113 S.Ct. at 2796 (footnotes omitted).

In vesting the power within the district court to make this determination, the Court specifically recognized the "gatekeeping function" of the district court. *Daubert*, — U.S. at ——, 113 S.Ct. at 2798; *Id.* at ——, at 2799 (Rehnquist, C.J., concurring in part and dissenting in part) ("I do not doubt that Rule 702 confides to the judge some gatekeeping

---

**3.** Until *Daubert*, the majority of federal courts applied the *Frye* standard to determine the admissibility of scientific evidence. The *Frye* test held "inadmissible expert testimony based on a scientific technique unless that technique is generally accepted as reliable in the relevant scientific community." *O'Conner*, 13 F.3d at 1106 n. 15; *Porter*, 9 F.3d at 612 n. 3.

**4.** Rule 702, which governs the admissibility of expert testimony, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to under-

stand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Fed.R.Evid. 702.

**5.** Although the Supreme Court rejected *Frye*'s "general acceptance" theory as the test governing the admissibility of scientific evidence, the Court still recognized that " 'general acceptance' can yet have a bearing on the inquiry." *Daubert*, — U.S. at ——, 113 S.Ct. at 2797.

responsibility in deciding questions of the admissibility of expert testimony"); *Wilson v. City of Chicago,* 6 F.3d 1233, 1238 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994). "Under the Rules, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795; *see Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 187 (7th Cir.1993).

■ In the instant case, the district court properly carried out this function and applied the *Daubert* standards to determine whether to admit the testimony of Drs. Rea and Johnson. The district court, after making detailed findings of fact, addressed each element of relevant Indiana state law regarding negligence and found that Brown had breached his duty of care. The court then undertook an in-depth discussion of the proximate cause of the plaintiffs' injuries and the possibility that MCS was that cause. The court began its discourse by acknowledging the intricacies of the scientific issues and their relationship with the causation requirement in hazardous substance litigation. The court next noted the complexity of MCS's etiology, that is, the factors that cause and contribute to the occurrence of MCS. Turning to the specific issues raised in Brown's motion *in limine,* the court embarked on a thorough discussion of Fed.R.Evid. 702, *Daubert,* and this Court's precedents. The court noted that "scientific knowledge" is no longer defined by the *Frye* test's "general acceptance" approach, but rather by *Daubert's* focus on "evidentiary reliability" and "trustworthiness." 852 F.Supp. at 698 (quoting *Daubert,* —— U.S. at ——, n. 9, 113 S.Ct. at 2795, n. 9). While recognizing that it should not assume the role of a scientist, the court viewed its role in making this "trustworthiness" determination as one of discovering if the methodology is scientifically valid. It proceeded to utilize *Daubert's* framework in making this determination.

■ The first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method. The court, having examined "in depth" the "literally hundreds of pages of material dis-

cussing MCS," concluded that the "plaintiffs fail to establish that the etiology of MCS, accepting *arguendo* that such a clinical entity exists, is known or tested at this point." 852 F.Supp. at 698. While not attacking the credentials of Drs. Rea and Johnson, the court noted that "[t]he problem the court faces here is that Rea and Johnson's opinions about MCS's causes are, at best, hypothetical at this point." *Id.* at 698–99. Looking to the evidence submitted by the plaintiffs, the court found that Rea and Johnson could not provide testimony explaining why a particular individual contracts a chemical sensitivity; the method leading to their conclusions was merely anecdotal. The court concluded that "Drs. Rea and Johnson's opinions regarding whether the plaintiff's exposure caused their symptoms would be entirely too subjective and speculative [and] ... a far cry from the tested hypotheses foreseen as the basis of 'scientific knowledge' testified to under Rule 702." *Id.* at 698, 699.

The court next engaged in the positive "peer review" of clinical ecology. After examining these sources and deciding that the literature raised further doubts as to the explanations of the causes of MCS, the district court determined that the evidence pointed to the conclusion that the " 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge." *Id.* at 700. The court ultimately concluded that:

Plaintiffs have failed to show that Rea and Johnson's theories concerning MCS's causes have been adequately tested; their own evidence suggests just the opposite. As the Seventh Circuit most recently stated, albeit in a different context, '[s]cientific controversy must be settled by the methods of science rather than by the methods of litigation.'

*Id.* at 700 (citation omitted).

Our review of the district court's analysis reveals that the court more than adequately adhered to the *Daubert* framework. The district court took its gatekeeping function conscientiously while at the same time refusing to "don the amateur scientist's cap in ruling on scientific validity." 852 F.Supp. at

698 (citing *Daubert,* —— U.S. at ——, 113 S.Ct. at 2800 (Rehnquist, C.J., concurring in part, dissenting in part)). The court appropriately investigated the scientific methodology of MCS against the backdrop of the facts of this case and followed the Supreme Court's admonition that "the focus, of course, must be solely on the principles and methodology, not on conclusions they generate." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2797. In reaching its decision, the court carefully examined all of the evidence presented. While we do not comment on the scientific validity of Drs. Rea and Johnson's theories regarding MCS, we believe that the district court carefully followed the analytical approach established in *Daubert.* We will thus not replace the district court's careful decision with our own judgment.

For the foregoing reasons, the district court's decision is AFFIRMED.