Jon Bradley SUMMERS and
Glyn E. Potts, Plaintiffs,

v.

MISSOURI PACIFIC RAILROAD SYS-
TEM, a railroad corporation, d/b/a Un-
ion Pacific Railroad, Defendant.

No. 94–468–P.

United States District Court,
E.D. Oklahoma.

Aug. 25, 1995.

Jerald J. Bonifield, Belleville, IL, for plaintiffs.

Tom L. Armstrong, Tulsa, OK, David Lee Crawford, Houston, TX, for defendant.

## ORDER

PAYNE, United States Magistrate Judge.

This matter came on for hearing on June 12, 1995, before Magistrate Judge James H. Payne pursuant to an order issued by this court. The plaintiffs appeared by and through their attorney of record, Jerald J. Bonifield, and the defendant was represented by counsel of record, Tom L. Armstrong and David Lee Crawford. After consideration of all pleadings on file herein, and the arguments and statements of counsel this court finds that the testimony of Drs. Alfred Johnson, D.O. and Susan Franks, Ph.D., should be excluded.

The record reveals the following factual background. On July 5, 1993, Plaintiffs, and an additional crew member, not a party to this litigation, were scheduled to deadhead[1] by train between McAlester, Oklahoma, and Fort Worth, Texas. Plaintiffs Potts and Summers both resided in the Fort Worth area. On the previous day, they had served as the operating crew on a train from Fort Worth to McAlester. On June 5, they reported to the station at McAlester at approximately 3:15 in the afternoon to deadhead by train back to Fort Worth. While train crews are typically deadheaded by private van service, occasionally they are deadheaded by train.

The train left McAlester at 3:50 in the afternoon. Plaintiffs Summers and Potts were both seated in the second locomotive of a train that was comprised of four locomotives. Approximately 40 miles out of McAlester, Plaintiff Summers complained of a headache. Plaintiff Potts at the same time complained of a tightness in his chest. Plaintiff Potts contacted the dispatcher by radio, advised her that the crew was feeling ill and needed to be relieved. A short time later, the dispatcher notified Plaintiffs Summers and Potts that she was getting a van to meet them in Denison, Texas. Plaintiffs Potts and Summers got off the train in Denison at approximately 6:15 P.M. The total time spent on the train was approximately two hours and 25 minutes. Plaintiffs traveled approximately 98 miles. Plaintiffs did not request medical attention in Denison. Upon arriving at Fort Worth, Plaintiffs Summers and Potts, along with the third deadheading crew member, went to the Harris Methodist H–E–B Hospital in Bedford, Texas. Arterial blood tests were done. Arterial blood gas tests were normal. Plaintiff Summers carbon monoxide level was elevated, but the degree of elevation was normal for a heavy smoker. Plaintiffs were then released and told they could return to work.

Plaintiff Summers and Potts complained of continuing problems, and were referred to the Environmental Health Center in late June, 1993. Plaintiff Summers was first seen by the Environmental Health Center on June 24, 1993. Plaintiff Potts was first seen the next day. Plaintiffs were eventually diagnosed by Dr. Alfred Johnson, D.O., as having become chemically sensitized to petrochemical components such as diesel and other petrochemical compounds. The actual diagnosis was toxic exposure to diesel fumes resulting in chemical sensitivity.

Subsequent to the diagnosis by Dr. Johnson, Plaintiffs were referred to Dr. Thomas Chester, M.D., who determined that each of the plaintiffs had received a toxic exposure on June 5, which he characterized as mild in both instances. Dr. Chester found that Glyn Potts was unable to return to his former employment, but based that determination on findings unrelated to the toxic exposure, and determined that Brad Summers may have been suffering from depression, as opposed to toxic exposure. Dr. Chester recommended a neuropsychiatric evaluation which was conducted by Dr. Susan Franks, a psy-

---

1. Deadheading is the practice whereby train crews are transported from one location to another, usually, as in this case from the place of destination back to the place of original origination.

chologist.[2] Dr. Franks found that Mr. Summers had suffered a toxic exposure and that he functioned in a brain damaged category.

Plaintiff Potts was born on March 5, 1941. Mr. Potts was 52 years old on June 5, 1993. He started work for the railroad on October 3, 1973. Mr. Potts medical history reveals that he had a kidney removed in 1982, a kidney transplant; in 1983, a heart attack in May 1992, and a second heart attack in December 1993. Mr. Potts smoked cigarettes for 30 years, and at the time he quit smoking in 1990, was smoking up to three packs daily.

Plaintiff Summers was born August 31, 1960. He was 32 years old on June 5, 1993. Plaintiff Summers began working for the railroad on October 16, 1979. As of June 5, 1993, Plaintiff Summers smoked five cigars daily, inhaling when he smoked.

Plaintiffs allege that Defendant violated the provisions of the Federal Employers' Liability Act in that it failed to provide safe transportation during the deadheading operation. Plaintiffs further contend Defendant violated the Boiler Inspection Act in that the locomotive engine, in which Plaintiffs were riding during the deadheading operation, was not in a proper and safe condition and that the failure of the engine to have a safe and well ventilated passenger compartment created an unnecessary peril to the life and limb of Plaintiffs. Each of the Plaintiffs claim that they sustained inhalation injuries as a result of the excessive exposure to diesel exhaust fumes and that they have a separate permanent injury, disability, and loss of earning capacity as a result of this injury.

Specifically, in regard to Plaintiffs' alleged permanent injuries and resulting damages, Plaintiffs claim they suffer from chemical sensitivity, a recognized medical diagnosis (Plaintiffs' Response Br. at 8). Defendant contends, however, that the true diagnosis of Plaintiffs' expert, Alfred R. Johnson, D.O., is "multiple chemical sensitivity" ("MCS"), a diagnosis which is not supported by sound scientific reasoning or methodology, and should be excluded pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

Dr. Johnson practices clinical ecology, and is an advocate of the diagnosis of MCS (Johnson Depo. at 12, 163, 168–169, 176–179) (Carson Depo. at 16). "Clinical ecologists claim that various kinds of environmental insults may depress a person's immune system so that the exposed person develops a 'multiple chemical sensitivity,' that is, becomes hypersensitive to other chemicals and naturally occurring substances." *Manual on Scientific Evidence Federal Judicial Center*, at 73–74 (Federal Judicial Center, 1994). Clinical ecologists have not been recognized by traditional professional organizations within the medical community. *Id.* The leading professional societies in the fields of allergy and immunology have also rejected clinical ecology "as an unproven methodology lacking any scientific basis in either fact or theory." *Id.* Further, MCS is not a diagnosis that is accepted within the medical community.

The 1991 American College of Occupational and Environmental Medicine (ACOEM) Statement on MCS which states in pertinent part:

> Multiple chemical hypersensitivity syndrome (MCHS) is one of over 20 names or descriptions (20th century disease, environmental illness, total allergy syndrome, chemical AIDS, etc.) given to a clinical complex characterized by recurrent polystem symptoms often without observable physical findings or laboratory abnormalities believed to be associated with repeated exposure to specific biological, chemical agents. Practitioners involved in the diagnosis and treatment of this phenomenon may identify themselves as clinical ecologists or environmental medicine specialists.

**2.** Dr. Franks was not licensed in Texas at the time the evaluation of Mr. Summers was performed. However, Dr. Franks was a Ph.D. graduate, had fulfilled all necessary requirements, and had taken the necessary test to be licensed by the State of Texas. Dr. Franks received her license approximately three months after the evaluation of Mr. Summers. Plaintiffs represent that Dr. Franks work was being overseen and reviewed by a licensed psychologist, Dr. James Hall, who agreed with the findings of Dr. Franks. Dr. Franks had received her Texas license before her deposition was taken and she had not changed any of her opinions stated therein.

The pathophysiological mechanisms described by these practitioners do not in general conform to what is currently known of human biological functions. To explain the phenomenon these practitioners draw on new or modified mechanisms such as "total body load, spreading, or switching." The scientific foundation for managing patients with this syndrome has yet to be established by traditional clinical investigative activities that withstand critical peer review ... the scientific and clinical evidence supporting the pathophysiological mechanisms and treatment regimes as articulated by these practitioners is lacking. It is the position of the ACOEM that the MCHS is presently an unproven hypothesis and current treatment methods represent an experimental methodology....

(Carson Depo. Ex. 2).

In an addendum to this position, ACOEM approved the following statement regarding MCS on April 27, 1993:

Increasingly, multiple chemical sensitivities (MCS) has become a troublesome medical concern for individuals and their physicians.... The science is indeterminate about MCS as a specific entity and the cause and effect relationships have not been clearly established.

(Carson Depo. Ex. 2).

Additionally, in 1992 the Council Report on Clinical Ecology issued by the Council on Scientific Affairs, American Medical Association stated:

Two medical societies [American Academy of Allergy and Immunology, and California Medical Association], have issued position papers and one [The American College of physicians] has issued an informational report on clinical ecology. The position papers reported that no scientific evidence supports the contention that MCS is a significant cause of disease or that the diagnostic tests or treatments used have any therapeutic value. Until such accurate, reproducible, and well-controlled studies are available, the American Medical Association Council on Scientific Affairs believes that multiple chemical sensitivity should not be considered a recognized clinical syndrome.

Based on the reports in the peer-reviewed scientific literature, the Council on Scientific Affairs finds that at this time (1) there are no well-controlled studies establishing a clear mechanism or cause for MCS; and (2) there are no well-controlled studies providing confirmation of the efficacy of the diagnostic and therapeutic modalities relied on by those who practice clinical ecology.

(Carson Depo. Ex. 3).

The position paper of the American College of Physicians issued in 1989 stated:

Clinical ecologists propose the existence of a unique illness in which multiple environmental chemicals, foods, drugs, and endogenous C, albicans have a toxic effect on the immune system thereby adversely affecting other bodily functions. The proposal uses some concepts that superficially resemble those that apply to clinical allergy and toxicology and others that are novel.

Review of the clinical ecology literature provides inadequate support for the beliefs and practices of clinical ecology. The existence of an environmental illness as presented in clinical ecology theory must be questioned because of lack of a clinical definition. Diagnoses and treatments involve procedures of no proven efficacy.

(Carson Depo. Ex. 4).

The Position Paper issued by the American Academy of Allergy and Immunology in August of 1986 states:

The environment is very important in the lives of every human being. Environmental factors, such as chemicals and pollutants, have been demonstrated to influence health. The idea that the environment is responsible for a multitude of human health problems is most appealing. However, to present such ideas as facts, conclusions, or even likely mechanisms without adequate support is poor medical practice. The theoretical basis for ecological illness in the present context has not been established as factual, ... There are no adequate studies of the cyclic diets, elimina-

tion diets, injection therapy with chemicals, or even the environmentally controlled units to substantiate their use. Many of the patients are reported to have a normal physical examination and normal laboratory tests.

There are no immunological data to support the dogma of the clinical ecologists. To suggest that these patients lack suppressor T cell function has not been supported by controlled clinical studies or immunological data.

An objective evaluation of the diagnostic and therapeutic principles used to support the concept of clinical ecology indicates that it is an unproven and experimental methodology. It is time-consuming and places severe restrictions on the individual's life-style. Individuals who are being treated in this manner should be fully informed of its experimental nature.

(Carson Depo. Ex. 5).

The testimony of Plaintiffs' expert, Dr. Alfred Johnson, has previously been excluded under similar circumstances by the Seventh Circuit Court of Appeals in *Bradley v. Brown*, 42 F.3d 434 (7th Cir.1994).[3] In *Bradley*, the trial court excluded the testimony of Dr. Johnson and his colleague, Dr. William J. Rea, who would have testified that the plaintiffs were suffering from MCS as a result of exposure to the defendant's pesticides. The court of appeals held that the trial court had properly followed the *Daubert* framework and had not abused its discretion. The trial court had found that the etiology of MCS was not known or tested, and that the scientific literature raised doubts about the experts' methodology. Since the experts' conclusions were considered "hypothetical", the trial court found that they could not assist the factfinder and were properly excluded under Fed.R.Ev. 702. The court noted:

> Rea states frankly in his own recent book that: "[W]e do not know at this time the initial mechanism by which good health gives way to *chemical sensitivity.*" Accordingly, any opinion that the April 20,

1983 exposure induced MCS in Bradley and Roy would be only slightly diluted speculation. Such a conclusion would necessarily rest on uncontrolled past observations. An example is Rea's statement that soldiers' exposure to mustard gas in World War I and Agent Orange in Viet Nam, and citizens' exposure to cyanate in Bhopal, India after a chemical plant accident there, "all graphically illustrate that chemical sensitivity may be caused by a significant, acute exposure to toxic substances." There is no indication either in Rea's book or in other proofs submitted to the court that the victims of these exposures were even diagnosed with MCS. Rea's contrary conclusion is exempletive of the sort of reasoning that, no doubt, leads many scientists to dismiss the work of clinical ecologists as "anecdotal." It is a far cry from the tested hypothesis foreseen as the basis of "scientific knowledge" testified to under Rule 702.

*Bradley* 852 F.Supp. 690, 699 (N.D.Ind.1994) (citations omitted) (emphasis added).

Likewise, in the instant case Dr. Johnson admitted that the mechanism by which chemical sensitivity occurs is unknown (Johnson Depo. at 22–23, 55, 175). Dr. Johnson testified:

Q. Well, how are these unknown substances acting on Mr. Potts body to produce these symptoms at this present day?

A. Well, as I said, the mechanisms of the sensitivity are unknown. We know that the substances do cause changes in cellular function, but exactly how all that occurs is unknown at this point.

Q. Okay. What changes in cellular—are you saying that it is because of a change in cellular function that Mr. Potts has mental confusion, dizziness, or lack of concentration?

A. That is one of the theories, yes, on how that works.

Q. Okay. And that is a theory; is that not correct?

---

**3.** Prior to *Daubert*, Dr. Johnson's MCS testimony was excluded in *Viterbo v. Dow Chemical*, 826 F.2d 420, 424 (5th Cir.1987). The Fifth Circuit found "... Dr. Johnson's testimony is no more than Viterbo's testimony dressed up and sanctified as the opinion of an expert."

A. Yes.

Q. You haven't demonstrated specifically with respect to Mr. Potts that—that a cellular function is responsible for mental confusion, dizziness, or lack of concentration, have you?

A. Not to that correlation.

(Johnson Depo. at 94–95).

Further, Dr. Arch I. Carson's testimony correlates with the position of the various medical societies in regard to the incapability of testing for MCS:

Q: Now is that diagnosis of chemical sensitivity or multiple chemical sensitivity one—you said it was not one which is generally accepted within the medical community. Can you tell us why?

A: Because it is characterized by the appearance of a number of various symptoms that vary from one individual to another that have little relationship that's scientifically testable between any kind of given exposure, and these symptoms are essentially attributed to the reactions to chemicals that are encountered within the environment.

Q: What type of chemicals could these consist of, according to that theory?

A: Any kind of chemicals. These are primarily manmade chemicals that are singled out as being responsible, but not entirely.

(Carson Depo. at 27–28).

 Therefore, insofar as Plaintiffs propound MCS as a valid diagnosis, this court adopts and agrees with the well reasoned opinion in *Bradley.* "The 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge." *Id.* at 700. As *Daubert* recognized, "[t]he scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses"; by contrast, "in the project of reaching a quick, final, and binding legal judgment ... about a particular set of events in the past," the court must weed out the speculative hypothesis from the tested theory. 509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 485. However, this does not conclude the court's analysis. Because Plaintiffs acknowledge that chemical sensitivity and MCS are not the same thing, and state that "we are not dealing with Multiple Chemical Sensitivity ...", the court finds that the focal point of this inquiry should be directed to the actual diagnosis of Dr. Johnson (Plaintiffs' Response Br. at 8). If Dr. Johnson's diagnosis is that of chemical sensitivity, as opposed to MCS, the parties agree it is a recognized medical diagnosis. It is the contention of Defendant, however, that although Dr. Johnson uses the words "chemical sensitivity", he has not made this diagnosis. "In short, while Alfred R. Johnson, D.O. has made the diagnosis of "chemical sensitivity," the symptoms upon which the diagnosis is made are those of MCS. The evidence clearly demonstrates that when Alfred R. Johnson, D.O., uses the term "chemical sensitivity," he uses it in place of MCS." (Defendant's Reply Br. at 2). The court agrees and finds that the diagnosis made in this case by Dr. Johnson is not that of "chemical sensitivity" in the generally accepted sense, but rather that of "chemical sensitivity" which is synonymous with MCS.

Dr. Johnson acknowledges in his deposition his affiliation with The American Academy of Environmental Medicine which was originally called The Society for Clinical Ecology (Johnson Depo. at 196–198). The position papers of the various medical societies cited by this court are directed to The American Academy of Environmental Medicine. Dr. Johnson testified that he is in charge of the program for the academy on *"chemical sensitivity* ... which is an ongoing yearly educational ... symposium." (Johnson depo. at 12) (emphasis added). It is the clinical ecology usage of the term "chemical sensitivity" which Dr. Johnson has incorporated into his diagnosis of Plaintiffs.

Dr. Johnson defines "chemical sensitivity" in an article he co-authored with his colleague, Dr. Rea in the following manner: "Chemical sensitivity is defined as an adverse reaction to ambient doses of toxic chemicals in our air, food, and water at levels which are generally accepted as subtoxic." (Johnson Depo. at 172 and Defendant's Reply Br. Ex. K). However, in the instant case the diagnosis is made on the basis of an acute exposure,

rather than an exposure to an ambient dose at a level generally accepted as subtoxic.

In the instant case, Dr. Johnson distinguishes "chemical sensitivity" from MCS because MCS involves cases with no known triggering event:

Q. So the differentiation, then, between multiple chemical sensitivity syndrome and chemical sensitivity is that in multiple chemical sensitivity you can—a syndrome, you can have no known triggering event, then?

A. That's by definition.

Q. Okay. And I guess, then, if you have chemical sensitivity, then you have a known triggering event?

A. Correct. And that's the way it's defined when we originally defined it prior to this deposition today.

(Johnson Depo. at 163). Conversely, the trial court's opinion in *Bradley* demonstrates this definition is inconsistent with Dr. Johnson's testimony in that case. The *Bradley* plaintiffs claimed that they were suffering from MCS as the result of an exposure to pesticides occurring on April 20, 1993, that is a known triggering event. The facts in *Bradley* do not support Dr. Johnson's claim that MCS is used when the cause is unknown (Johnson Depo. at 177, 179).

Other evidence establishes that Drs. Rea and Dr. Johnson have used different terminology through the course of their practice. Dr. Thomas J. Chester, M.D.[4], who has treated patients of Drs. Rea and Johnson, testified that Drs. Rea and Johnson have used different terms for the same illness (Chester Depo. at 12–14). Dr. Chester, who has personally examined patients from the Environmental Health Center stated, "Basically, all the patients I've seen that have been to Drs. Rea and Johnson have the diagnosis multiple chemical sensitivity or some variance of it that they have used throughout the years, such as chemical sensitivity or environmental illness." (Chester Depo. at 13). When Dr. Chester was asked whether Dr. Rea and Johnson had used the same term for their diagnosis over the course of the years, or whether their diagnosis had changed, Dr. Chester responded, "Well, based on their records, they still—they take the same illness, and they have used at least three different terms that I know of for that illness." (Chester Depo. at 13). Dr. Chester elaborated:

Q. What terms have they used to talk about essentially the same illness?

A. Multiple chemical sensitivities, environmental illness and chemical sensitivity.

Q. Could you detect any difference in what they were referring to over the course of the years when they used these three different words to describe the same thing?

A. No, I could not.

Q. Have you been able to determine any reasons as to why there might be some change in the terms by which they are labeling this condition?

A. Well, it seems that the terminology they used changed when the medical community got vociferous in insisting there was no such diagnosis.

(Chester Depo. at 12–14).

Further enforcing the distinction in the instant case between MCS and the medically recognized form of chemical sensitivity are the subjective symptoms upon which clinical ecologists rely when making a diagnosis of MCS. These same symptoms can be attributable to a myriad of physical and psychological causes. The American Medical Association Council Report on Clinical Ecology states:

Some patients present to physicians with symptoms that cannot be attributed to any known condition, disorder, or disease. Further, they may have no physical findings or laboratory abnormalities to support a standard diagnosis. The constellation of symptoms presented (e.g., depression, fatigue, irritability, difficulty in breathing, headache, gastrointestinal distress, and

---

4. Dr. Chester received a bachelor of science degree from Massachusetts Institute of Technology, and a M.D. degree from Stanford University School of Medicine. Dr. Chester also obtained a masters degree of public health in epidemiology from the University of Washington (Chester Depo. at 3–8).

food intolerance) resemble those seen in many illnesses.

(Carson Depo. Ex. 3).

Plaintiffs' complaints demonstrate the diagnosis is MCS rather than chemical sensitivity. Plaintiffs complain of mood swings, headaches, fatigue, irritability, confusion, and difficulty with concentration, depression, dizziness and difficulty in breathing (Johnson Depo. at 48–67, 217–218). These symptoms randomly occur without a known causal event. Dr. Johnson explains the recurrent symptoms on reexposure to combustion products, i.e., a faulty heater at home, or a faulty exhaust pipe on your car (Johnson Depo. at 211–212). Dr. Johnson testified:

Q. If Mr. Summers, as I understand the theory of chemical sensitivity, had chemical sensitivity on June the 5th, 1993, the symptoms which he had could be triggered by even ambient levels of chemicals in the air or the food or the water?

A. If that was the scenario, then that is possible.

(Johnson Depo. at 216).

Dr. Johnson also testified that Plaintiffs could no longer work in a standard work environment because they "cannot tolerate standard chemical encounter in the work environment such as pesticides, perfumes, cleaning products. All these things have to be altered in his daily life." (Johnson Depo. at 39–40). These symptoms are those of MCS, not chemical sensitivity, which involves a demonstrable reaction upon exposure to a single chemical, or small group of closely related chemicals (Chester Depo. at 30). Dr. Chester estimated the probability that three individuals would have a sensitivity to a specific chemical at one in a million (Chester Depo. at 80–82).

Additionally, the record does not demonstrate that Dr. Johnson has made a valid diagnosis of the generally accepted condition of chemical sensitivity based on objective testing. Dr. Chester testified that "the chemical sensitivity that's been accepted in the rest of the medical community can be tested ..." (Chester Depo. at 33–34). Dr. Chester explained that to objectively make such a diagnosis a doctor would need to administer either a scratch test, patch test, or a RAST test for IG antibodies. Based on

his review of Dr. Johnson's records Dr. Chester concluded that Dr. Johnson has not made a valid diagnosis of the generally accepted condition of chemical sensitivity (Chester Depo. at 33–34). In fact, Dr. Johnson testified that he based his diagnosis of chemical sensitivity on the patients' history, a physical examination and the results of a Booth test (Johnson Depo. at 185). Dr. Johnson also later ordered a Spect test. The record reveals that both of these tests have been the subject of much criticism by the scientific community as not having met acceptable scientific levels of methodology and criteria, and are not designed to test for the recognized medical condition of chemical sensitivity (Chester Depo. at 20–27).

■ Likewise, the court also finds the neurophysiological evaluation of Plaintiff Summers conducted by Dr. Susan Franks, Ph.D., should be excluded because Dr. Franks, a psychologist, is not an expert in the field of medicine or toxicology. The question of causation is a medical issue, and as the court has found, the record does not support a diagnosis of MCS, or long-term injuries due to short-term exposure to diesel exhaust. *See generally, Cavallo v. Star Enterprise, et al.,* 892 F.Supp. 756 (E.D.Va.1995).

Dr. Franks stated that her job was not to make a diagnosis of environmental illness (Franks Depo. at 144). Although Dr. Franks does not claim to make a medical diagnosis, she did find that Plaintiff Summers' symptoms were "consistent with" toxic exposure (Franks Depo. at 30, 54). Dr. Franks concluded that Plaintiff was experiencing a "probable" dementia that was also consistent with toxic exposure and that Plaintiff is now suffering in a brain damaged category (Franks Depo. at 30, 34).

There is no reliable scientific evidence to support such a conclusion. Three physicians have emphatically stated, including Plaintiff Potts' own cardiologist, that there are no long-term effects to a short-term exposure to diesel exhaust. Dr. Phil Lobstein, M.D., stated:

A: No. We saw no acute—There's no evidence of any carbon monoxide poisoning. It is correct when it's removed from that situation, those symptoms and signs clear fairly quickly.

Q: How soon would you expect those signs and symptoms to clear upon removal from carbon monoxide?

A: Certainly within one to two days.

(Lobstein Depo. at 39).

The affidavit of Roy L. DeHart, M.D., MPH, corroborates Dr. Lobstein's opinion that there is no causal link between exposure to diesel exhaust and long-term or permanent damages. Dr. DeHart states in his affidavit:

In addition, I am familiar with the health effects of exposure to diesel exhaust. It is widely accepted in the medical community that diesel exhaust fumes may cause certain adverse health effects. Over-exposure to these fumes may produce symptoms of mucous membrane irritation, eye irritation, throat irritation, headache, light-headedness and nausea. These symptoms have repeatedly been demonstrated to be short-lived and usually resolve within 2 (two) days of exposure. The literature is lacking in the demonstration of short-term low level exposure to diesel fumes producing long-term adverse health effects. There is also a lack of literature relating MCS to short-term diesel exposure.

(DeHart Affidavit; Defendant's Br. Ex. B).

Moreover, Dr. Thomas J. Chester, M.D., agrees with these conclusions. Dr. Chester's opinion on the matter is stated as follows:

Q: Are there any known long-lasting health effects to an acute exposure to carbon monoxide where the level is such that it only causes headaches or nausea?

A: With regard to the headaches and nausea, those—those are not long-term or permanent effects, and they go away.

Q: Okay.

A: They go away in a short period of time.

Q: Okay.

A: Certainly not weeks or months or years but days at the most.

(Chester Depo. at 66).

■ Therefore, based upon the evidence and testimony submitted, there is no reliable scientific evidence to support Dr. Frank's conclusion that Plaintiff Summers is suffering dementia or functioning in a brain damaged capacity due to his short-term exposure to diesel exhaust.

Further, it is apparent from the record that Dr. Frank's findings were based in part on a research edition of psychological test (Franks Depo. at 95). The Clinical Differential Analysis Test (the "CEDA" test) is in the research stage and has not been validated (Franks Depo. at 102–103). Dr. Franks, along with Dr. Joel Butler, are in the process of developing this test, and a test manual representing validity data has not been written (Franks Depo. at 102–103). Dr. Butler is a colleague of Drs. Rea and Johnson at the Environmental Health Center, having done work as a consultant (Johnson Depo. at 171). Dr. Butler is listed as a coauthor with Drs. Rea and Johnson in at least one article (Johnson Depo. at 169). Dr. Butler is also listed, along with Dr. Rea, as a presenter before the California Medical Association's Scientific Board Task Force on Clinical Ecology (Carson Depo. Ex. 6). The only persons who can interpret the CEDA test are Dr. Susan Franks and Dr. Joel Butler (Franks Depo. at 171–172). Moreover, the majority of persons to whom the test has been administered have come from the ranks of patients referred by Dr. Lieberman, an environmental doctor in South Carolina, and the Environmental Health Center in Dallas, Texas (Franks Depo. at 116, 138–139).[5] The test has not been presented to any organizations within the field of neuropsychology (Franks Depo. at 99). Those patients included in the test category for environmental illness included patients with chemical sensitivity (Franks Depo. at 124).

■ In conclusion, *Daubert* entrusted the courts to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodolo-

---

**5.** Drs. Rea and Johnson are joint owners of the Environmental Health Center in Dallas, Texas

(Johnson Depo. at 172).

gy properly can be applied to the facts in issue. *Daubert,* 509 U.S. ——, 113 S.Ct. at 2796. "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* The Supreme Court concluded that the test for the admissibility of scientific evidence enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir. 1923), had been superseded by the Federal Rules of Evidence. The Court determined that Fed.R.Evid. 702 anticipated "some degree of regulation of the subjects and theories about which an expert may testify." *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2795. Rule 702 explicitly requires that the testimony "assist the trier of fact to understand or determine a fact in issue." Fed.R.Evid. 702. This standard of helpfulness "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility" *Daubert,* 509 U.S. at ——, 113 S.Ct. at 2796.

■ The Court in *Daubert* also recognized and accepted that this gate-keeping function "on occasion will prevent the jury from learning of authentic insights and innovations." *Id.* Nonetheless, the court must answer the question before it based on current knowledge. Accordingly, this court finds that Dr. Johnson's true diagnosis is that of MCS and insofar as Plaintiffs have espoused such a theory they have failed to show that the theories concerning MCS's causes have been adequately tested. As the court in *Bradley* stated, "[s]cientific controversies must be settled by the methods of science rather than by the methods of litigation." *Bradley,* 852 F.Supp. at 700, *citing, Underwager v. Salter,* 22 F.3d 730, 736 (7th Cir.1994). Accordingly, Defendant's Motion to Exclude the testimony of Dr. Johnson and Dr. Franks is granted: the court will not permit evidence evincing long term effects to a short-term exposure to diesel exhaust when there is no reliable scientific evidence to support such a theory.

IT IS SO ORDERED.