**Marion COFFIN, Plaintiff,**

v.

**ORKIN EXTERMINATING CO., INC., Defendant.**

**No. CIV. 97–258–B.**

United States District Court,
D. Maine.

July 21, 1998.

William Robitzek, Berman & Simmons, Lewiston, ME, for Plaintiff.

Peter Culley, Pierce Atwood, Portland, ME, LeAnn Jones, Powell, Goldstein, Frazer & Murphy, Atlanta, GA, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, Marion Coffin, filed this suit alleging negligence and strict liability claims arising out of the application of various pesticides in Plaintiff's office building by Defendant, Orkin Exterminating Co., Inc. Before the Court are Defendant's Motion in Limine to Exclude Evidence of "Multiple Chemical Sensitivity" or "Hypersensitivity to VOC's" and Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff is employed by the State of Maine Department of Labor ("DOL") and works in the Department's office building at 20 Union Street in Augusta, Maine. In August of 1994, the DOL contracted with Defendant, a commercial exterminating company, to provide pest control services at its Union Street building. Defendant applied pesticide throughout the building on or about August 19, September 25, October 4, October 13, November 10, December 15, 1994, and January 18, 1995. Plaintiff alleges that Defendant sprayed pesticides in the presence of people without warning them about the dangers of pesticide exposure, that pesticides were sprayed on walls and window sills in the presence of unwrapped food, and that the building was not properly ventilated during the spraying. Plaintiff contends that on several of the application days she smelled a sweet scent and subsequently suffered painful bloating, cramping, blurred vision, and headaches that lasted through the following day. Plaintiff claims that as a result of these exposures to pesticides she contracted a disease known as multiple chemical sensitivity ("MCS") which renders her hypersensitive to normal, everyday levels of airborne environmental chemicals and pollutants.

## II. DISCUSSION

The Court first considers Defendant's Motion in Limine to exclude evidence of multiple chemical sensitivity.[1] The theory behind MCS is that "various kinds of environmental insults may depress a person's immune system so that the exposed person ... becomes hypersensitive to other chemicals and naturally occurring substances." Federal Judicial Center, Reference Manual on Scientific Evidence 73 (1994). Plaintiff's proposed expert, Dr. David L. Phillips II, who examined and treated Plaintiff, defines MCS in layman's terms as the display of "sinus and upper respiratory symptoms as well as a sense of ill health after being around noticeable ... [or] low levels of organic compounds such as gasoline fumes, cigarette smoke, photocopier,· printer and computer emissions, pesticide application, herbicide application, fresh paint, new carpet, new furniture." Phillips Dep. at 31. Dr. Phillips explains the symptoms of MCS as:

> [c]hronic, which is defined as being over four months in duration, sinus and/or upper respiratory symptoms as well as a sense of poor health such as fatigue, headache, loss of appetite, that occurs after exposure to VOC's that usually improves after they have been removed from the exposure; and then it recurs again with more exposure. And despite treating them for other possible diagnoses, they continue to ... have these chronic symptoms.

Phillips Dep. at 32. Although the Court is aware of no uniformly accepted definition of MCS, another court has noted that "all proposed definitions include elements of (1) a multi-symptomatic disorder; (2) affecting multiple organ systems; (3) resulting from exposure to a diverse array of chemical compounds at levels tolerable by the majority of the population." *Frank v. State of New York*, 972 F.Supp. 130, 132 n. 2 (N.D.N.Y. 1997).

Phillips offers the opinion that Plaintiff acquired MCS as a result of her exposure to the pesticides applied in her office building by Defendant. Phillips explains:

> [Plaintiff] had developed reversible hypersensitivity to volatile organic compounds until she was exposed to the pesticide spraying. After the pesticide spraying she developed irreversible, permanent hypersensitivity to volatile organic compounds as well as to pesticides (specifically organophosphate and pyrethrins).... It is my medical opinion within a reasonable degree of medical certainty that [Plaintiff's] medical conditions were caused to become irreversible and permanent by her exposure to pesticide spraying at a time when she had developed reversible hypersensitivity to volatile organic compounds. If she had not been exposed to pesticide spraying she probably would not have developed permanent hypersensitivity to volatile organic compounds. Also, she would not have developed type 2 immunologic reaction. Without the pesticide spraying exposure, it is probable that her hypersensitivity to volatile organic compounds would have been reversible.

Phillips Aff. Ex. A at 29.

Defendants move the Court to exclude all evidence relating to MCS, including the testimony of Dr. Phillips, on the ground that the diagnosis of MCS and the theories underlying it are unreliable and lack a scientifically valid basis.

Fed.R.Evid. 702, which governs the admissibility of expert testimony, provides that expert testimony is admissible only when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court concluded that when

> [f]aced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2)

---

1. Although Plaintiff's expert uses the terminology "hypersensitivity to volatile organic compounds" or "hypersensitivity to VOC's," it is clear that he is referring to the syndrome more commonly known as MCS. Phillips Aff. at 27–28. For the sake of clarity the Court will hereafter refer simply to MCS.

will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

At issue here is whether the witness is proposing to testify to "scientific knowledge," or, in other words, whether the evidence is reliable. *See id.* at 589, 113 S.Ct. 2786.[2]

[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability.

*Id.* at 590, 113 S.Ct. 2786. In determining whether the proposed evidence is reliable, courts are to consider several factors, including: (1) whether the scientific theory can and has been tested; (2) the extent to which the theory has been subject to peer review and publication; (3) the known or potential rate of error of any scientific technique at issue; and (4) whether the theory is generally accepted within the relevant scientific community. *Id.* at 592–95, 113 S.Ct. 2786. Although the inquiry is "a flexible one," *id.* at 594, 113 S.Ct. 2786, the Court must use these considerations to rule out "subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. 2786.[3]

■ "Every federal court that has addressed the issue of the admissibility of expert testimony on MCS under *Daubert* has found such testimony too speculative to meet the requirement of 'scientific knowledge.'" *Frank,* 972 F.Supp. at 136–37 (finding that "theory underlying MCS is untested, specula-

tive, and far from general acceptance in the medical or toxicological community" and "fails to meet the standard of evidentiary reliability established in *Daubert* ") (citing *Bradley v. Brown,* 852 F.Supp. 690, 700 (N.D.Ind.1994), *aff'd,* 42 F.3d 434 (7th Cir. 1994) ("plaintiff's own evidence clearly establishe[d] that the 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a fact-finder, jury or judge"); *Summers v. Missouri Pac. R.R. Sys.,* 897 F.Supp. 533, 542 (E.D.Okl.1995), *aff'd,* 132 F.3d 599 (10th Cir.1997) (adopting the reasoning and conclusions of *Bradley* and holding that plaintiffs "failed to show that the theories concerning MCS's causes have been adequately tested"); *Sanderson v. Int'l Flavors and Fragrances, Inc.,* 950 F.Supp. 981, 1002 (C.D.Cal.1996) (concluding that, "given the present knowledge, *Bradley* and *Summers* correctly determined that MCS does not represent the reliable 'scientific knowledge' which *Daubert* and Fed.R.Evid. 702 require"); *Carlin v. RFE Indus., Inc.,* No. 88–CV–842, 1995 WL 760739, at *4 (N.D.N.Y. Nov. 27, 1995) (plaintiffs failed to establish that MCS's etiology was currently known or tested)); *see also Cavallo v. Star Enter.,* 892 F.Supp. 756, 768 (E.D.Va.1995), *aff'd* in part and *rev'd* in part on other grounds, 100 F.3d 1150 (4th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998) (noting the "questionable scientific validity of MCS"); Kenneth R. Foster & Peter W. Huber, Judging Science: Scientific Knowledge and the Federal Courts 59 (1997) ("Chemical ecologists have failed to provide criteria that allow a doctor to decide when somebody does not suffer from MCS which is one of the main reasons MCS is regarded skeptically by mainstream medicine."); Federal Judicial Center, Reference Manual on Scientific Evidence 73 ("[c]linical ecologists have not been

2. The second inquiry, whether the testimony assists the trier of fact, is, in essence, a relevance inquiry. *Id.* at 591–93, 113 S.Ct. 2786. The Supreme Court described the relationship between a scientific theory and facts in issue as one of "fit." *Id.* at 591, 113 S.Ct. 2786.

3. To the extent that Plaintiff contends that *Daubert*'s analysis applies only to "hard science"

and not to the testimony of clinicians, the Court declines to adopt her view. Plaintiff relies exclusively on a strained reading of Justice Steven's dissent in *General Elec. Co. v. Joiner,* 522 U.S. 136, —— ——, 118 S.Ct. 512, 521–23, 139 L.Ed.2d 508 (1997), and a Fifth Circuit opinion, *Moore v. Ashland Chem., Inc.,* 126 F.3d 679 (5th Cir.1997), that has been vacated pending rehearing en banc.

recognized by traditional professional organizations within the medical community ... [t]he leading professional societies in the fields of allergy and immunology have rejected clinical ecology 'as an unproven methodology lacking any scientific basis in either fact or theory' ").

Since the *Frank* court's survey of federal caselaw on MCS, the Tenth Circuit has affirmed *Summers*, concluding that "MCS is a controversial diagnosis that has been excluded under *Daubert* as unsupported by sound scientific reasoning or methodology." *Summers*, 132 F.3d at 603. In addition, the Middle District of Alabama, after conducting its own review of the available scientific literature, was "unable to conclude that MCS etiology and the clinical ecology surrounding it are scientifically reliable" and excluded any evidence propounding a diagnosis of multiple chemical sensitivity, as well as any causes and treatments grounded in the etiology of MCS and clinical ecology. *Treadwell v. Dow–United Technologies*, 970 F.Supp. 974, 982 (M.D.Ala.1997).

The *Frank* and *Summers* courts engaged in thorough and exhaustive reviews of the medical literature available in 1997 in reaching the conclusion that evidence of MCS is too speculative and unreliable to meet the requirements of *Daubert*. The Court adopts the reasoning and conclusions employed in these cases. To the extent that Plaintiff suggests that these cases are "outdated," Plaintiff has failed to offer evidence that the methodology of diagnosing MCS is any more scientifically reliable today than it was in 1997.[4] The Court has carefully reviewed the articles offered by Plaintiff and is persuaded that, taken individually and as a whole, they do not support Plaintiff's argument that MCS's etiology has progressed from the plausible to scientific knowledge capable of assisting a fact-finder.[5]

## III. CONCLUSION

The parties agreed at the pretrial conference and in their pleadings that Defendant's Motion in Limine is in substance and effect a motion for summary judgment and that resolution of this motion in Defendant's favor would be dispositive of the case.[6] The Court is also persuaded, in light of the inadmissibility of evidence regarding MCS, that Plaintiff cannot prove the essential elements of her claims. Therefore, the Court need not address the additional arguments made in Defendant's Motion for Summary Judgment and GRANTS summary judgment for Defendant.

*SO ORDERED.*

---

4. The Tenth Circuit issued its opinion affirming *Summers* on December 23, 1997. Plaintiff does not offer, nor could the Court find, any more recent reported cases.

5. First, the Court notes that none of the offered articles were published subsequent to the *Frank* and *Summers* courts' thoughtful analyses of the available literature on MCS. Moreover, several of the articles, while endorsing the theories underlying MCS, in fact concede that MCS has yet to gain recognition in the medical community as a valid and reliable diagnosis. For example, Plaintiff offers Bernard Weiss, Experimental Strategies for Research on Multiple Chemical Sensitivity, an article published in 105 Environmental Health Perspectives 487 (1997). In that article Weiss notes:

The pivotal question posed to the members of the biomedical community is the authenticity of the multiple chemical sensitivity (MCS) syndrome. Do they accept it as a valid clinical entity? Most clinicians and biomedical scientists remain dubious, a point of view reflected in the American Medical Association's (AMA) position paper on clinical ecology.
*Id.*

6. Plaintiffs concede in their Response to Defendant's Motion in Limine that the motion in limine "is effectively one for summary judgment because, if it is granted, plaintiff will not be able to proceed because she will have no expert witness." Pl.'s Response to Def.'s Motion in Limine at 2 n. 2.