**Thelma Elizabeth TREADWELL,**
**Plaintiff,**

v.

**DOW–UNITED TECHNOLOGIES,**
**et al., Defendants.**

**Civ.A.No. 95–D–598–N.**

United States District Court,
M.D. Alabama,
Northern Division.

March 21, 1997.

Charles B. Paterson, Justice D. Smyth, III, Montgomery, AL, for Plaintiff.

David J. Middlebrooks, Steven Michael Stastny, Brent L. Crumpton, Birmingham, AL, for Defendants Dow, Vinson, Rittenberry and Jones.

Armstead Lester Hayaes, III, Montgomery, AL, for Defendant Vinson.

## MEMORANDUM OPINION AND ORDER

De MENT, District Judge.

Before the court are the following motions: defendants' motion for summary judgment filed June 14, 1996; defendants' supplemental motion for summary judgment filed January 21, 1997; and, defendants' first motion in limine filed February 18, 1997.[1] On March 12, 1997, the court entered a memorandum opinion and order which denied defendants' motion for summary judgment on plaintiff's claim brought under the Americans with Disabilities Act ("ADA"). The court now takes up defendants' motion for summary judgment on plaintiff's remaining pendent state claims and finds that summary judgment is due to be granted in favor of defendants.

## JURISDICTION

Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because plaintiff alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, Plaintiff also brings state law claims arising from the same transaction and occurrence as the alleged federal deprivation; therefore, the court may assert supplemental jurisdiction over plaintiff's state law claim. *See* 28

1. Defendants' first motion in limine is simply a recapitulation of defendants' argument which first appeared in their supplemental motion for summary judgment.

U.S.C. § 1367(a). Personal jurisdiction and venue are uncontested.

## FACTUAL BACKGROUND

In the spring of 1993, plaintiff began her employment with defendant Dow–United Technologies Composite Products, Inc. ("Dow–UT"). She trained for four weeks to work at Dow–UT's plant in Tallassee, Alabama, and a small part of her training included a safety course and video on the last evening of training. Trainees were told to wear personal protective gear of gloves and safety goggles and were informed about the existence of books of Material Data Safety Sheets which were kept at supervisors' desks.

After plaintiff completed her training, she was assigned to Dow–UT's plant in Montgomery, Alabama, where helicopter parts are assembled. Specifically, the plant designs, manufactures and markets advanced composite components for aerospace and defense markets. Plaintiff was placed in the Bonding Department, where she was required to handle and work with a low density, syntactic epoxy system known as Epocast 1652–A/B.[2] Once she was assigned to the Montgomery plant, plaintiff received no further safety training nor was she informed of any serious health risks related to the improper handling or usage of the particular products with which she worked.

On May 12, 1993, while drilling and sanding electrical boxes that contained the epoxy system, plaintiff experienced a serious allergic reaction. She informed her immediate supervisor, defendant Margie Rittenberry ("Rittenberry"), of the reaction and then visited the plant nurse. Plaintiff was diagnosed that same day by the plant doctor as having an "allergic reaction to an unknown substance" and the doctor instructed plaintiff to avoid the offending agent. Rittenberry later completed an Accident Investigation Report for Liberty Mutual Insurance Company, Dow–UT's Workers' Compensation carrier, in which Rittenberry identified the materials suspected of causing plaintiff's illness as "white Epocast."

Plaintiff alleged that upon returning to work, she informed both Rittenberry and Dow–UT's personnel manager Wayne Jones ("Jones") of the plant doctor's instructions to avoid the offending agent. In response, Jones informed plaintiff that she could safely return to work in the Bonding Department as long as she protected herself by wearing a lab coat with sleeve extensions and a full-face respirator. Rittenberry also informed plaintiff she was to return to work in the Bonding Department, telling her that she had "checked with" Jones and that he had said "it would be all right for [plaintiff] to go back to work in Bonding" as long as plaintiff wore the prescribed safety equipment. However, plaintiff found she was unable to wear the full-face respirator because it did not fit properly over her eyeglasses. In lieu of the respirator, Dow–UT provided plaintiff with a full-face shield and dust mask.

During this time, plaintiff met with John Vinson ("Vinson"), manager of the Montgomery plant in order to discuss her ten-day evaluation in which plaintiff's ability to cooperate with her fellow employees was rated unsatisfactory. During the conference with Vinson, plaintiff discussed her safety concerns with Vinson as she described the allergic reaction she had previously suffered and the doctor's instructions that she stay away from the "offending agent." Vinson reassured plaintiff that if she "would do what [she had] been told," then her "equipment [would] take care of [her]." Vinson, however, does not recall plaintiff telling him about her first allergic episode.

Plaintiff experienced another allergic reaction on May 27, 1993, when she was again drilling electrical boxes. Once again, plain-

---

**2.** "Epocast is a product manufactured by Ciba–Geigy's Furane Aerospace Products Division and is used, among other things, as a core fill for metal skins, adding stiffness and strength to the fabricated parts such as helicopter rotor blades." Pl.'s Compl. at ¶ 14. "Both Epocast 1652–A and 1652–B have been found to cause serious eye and skin burns, irritations and allergic skin reactions.

Contact with eyes, skin, mucous membranes and clothing must be avoided. At a minimum, individuals handling the material are required to use eye protection and impervious gloves. Vapor, mist or particles from the materials must not be inhaled, and proper ventilation is required for the safe use and handling of the material." Pl.s Br. (6/23/96) at 3.

tiff was instructed by the plant doctor to avoid the offending agent. After returning to work on May 28, 1993, plaintiff refused to return to the Bonding Department, where there was Epocast dust. In response, Rittenberry attempted to wipe away the dust. Then, Rittenberry and Vinson moved plaintiff to the "tip caps" department, which was the least dust-producing operating in the plant and was located farthest away from the bonding department.

On June 24, 1993, plaintiff suffered yet another allergic reaction. Plaintiff reported to the plant nurse who administered medication to plaintiff, and, plaintiff was able to return to work after approximately 20 to 30 minutes. Upon returning to the tip caps department, plaintiff wore a dust mask and worked with it in place for the balance of the day. At the end of plaintiff's shift on June 25, 1993, Dow–UT's personnel manager, Wayne Jones, terminated plaintiff's employment, explaining to her that while Dow–UT was satisfied with plaintiff's work, she was "too nervous" and not a "good fit" with the aerospace industry.

Plaintiff has since been diagnosed as suffering from an allergy to phenol and formaldehyde, which are both found in Epocast. Her current physician, Dr. Andrew M. Brown ("Brown"), contends that plaintiff continues to suffer from the long term effects of repetitive chemical exposures which occurred during her employment at Dow–UT and that these exposures have resulted in plaintiff's developing multiple sensitivities to other antigens in her environment. Defendants now move to exclude Brown's testimony, arguing that his expert testimony does not comply with the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Plaintiff brings the following state law claims: a workers' compensation claim against Dow–UT; claims of intentional and reckless fraud against Dow–UT, Rittenberry, Jones and Vinson; claims of intentional and reckless suppression against Dow–UT, Rit-

tenberry, Jones and Vinson; and claims of willful co-employee misconduct against Rittenberry, Jones and Vinson. Defendants move for summary judgment on all claims.

## I. MOTION TO EXCLUDE TESTIMONY

Before turning to defendants' motion for summary judgment on plaintiff's state claims, the court will first take up defendants' motion to exclude the testimony of Dr. Brown. Defendants anticipate plaintiff will rely on the expert testimony of Dr. Brown, who is an otolaryngologist (an ear, nose and throat specialist) and plaintiff's treating physician. Defendants expect Dr. Brown to testify that (1) plaintiff suffers from a condition known as multiple chemical sensitivity ("MCS"), (2) that MCS is recognized as a legitimate medical condition, (3) that he has the necessary expertise to make such a diagnosis, and (4) that plaintiff contracted this condition as a direct and proximate cause of her exposure to white Epocast while she was employed at Dow–UT. Contending that Dr. Brown is a "clinical ecologist" who lacks a reliable basis for his expert opinion and testimony, defendants argue that Dr. Brown's proposed testimony is inadmissible under the guidelines established in *Daubert*, 509 U.S. 579, 113 S.Ct. 2786.

In response,[3] plaintiff states that Dr. Brown's testimony is not confined to his professional opinion regarding the existence of MCS. Instead, plaintiff expects Dr. Brown to testify concerning his own examination, diagnosis and treatment of plaintiff for her "hypersensitivity to phenol and formaldehyde and the many products which contain those substances as constituent parts." Letter Br. at 2. Additionally, Dr. Brown is expected to testify that plaintiff's hypersensitivity is a direct and proximate response to her exposure to dust created when she drilled into electrical boxes containing a core fill of an epoxy resin (white Epocast) containing phenol and formaldehyde. *Id.* Finally, plaintiff argues that testing, diagnosis and treatment for phenol or formaldehyde sensitivity has

**3.** Plaintiff's response can be found in a letter brief filed with the court on March 10, 1997, as well as in plaintiff's brief in opposition to defendants' motion for summary judgment (100–114)

and plaintiff's response in opposition to defendants' supplemental motion for summary judgment (76–77, 81–90, 101–112).

been subjected to publication and peer review and is generally accepted in the scientific community, thereby easily falling within the parameters set by *Daubert* and Federal Rule of Evidence 702. *Id.*

 Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." When faced with a proffer of expert scientific testimony, the trial judge must exercise a gate-keeping function and

> determine at the outset, pursuant to Rule 104(a) [Federal Rules of Evidence], whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796. Rule 702's requirement that the trial court determine the scientific validity of an expert's opinion ensures "some degree of regulation of the subjects and theories about which an expert may testify." *Id.* at 589, 113 S.Ct. at 2795.

The Supreme Court has stressed, however, that the Rule 702 inquiry is "a flexible one." *Id.* at 594, 113 S.Ct. at 2797. "Its overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions they generate." *Id.* at 594–95, 113 S.Ct. at 2797. Moreover, the testimony need not be known to a certainty,

> [b]ut in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the

requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Id.* at 590, 113 S.Ct. at 2795.

 Although the Supreme Court declined to set out an exhaustive list of factors governing the validity of a scientific principle, the court emphasizes four factors that may bear on the inquiry: (1) whether the principle has been or can be tested; (2) whether the principle has been subject to peer review and publication; (3) whether the known or potential rate of error associated with the principle is excessive and (4) whether the principle has achieved widespread acceptance in the scientific community. *Id.* at 591–95, 113 S.Ct. at 2796–97. In making its inquiry, however, the court must "be careful not to cross the line between deciding whether the expert's testimony is based on scientifically valid principles and deciding upon the correctness of the expert's conclusions. The latter inquiry is for the jury and, therefore, judges may not implicitly factor it into their assessment of reliability." *Joiner v. General Elec. Co.,* 78 F.3d 524, 530 (11th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 1243, 137 L.Ed.2d 325 (1997).

 "[T]he critical concerns of Rule 702 are evidentiary reliability and relevancy." *Joiner,* 78 F.3d at 529. These twin concerns are synthesized in *Daubert* as a two-step inquiry. First, the court must determine whether an expert's proposed testimony pertains to scientific knowledge by applying the criteria suggested in *Daubert.* 509 U.S. at 589–90, 113 S.Ct. at 2795. This task requires the court to rule out "subjective belief or unsupported speculation." *Id.,* 509 U.S. at 590, 113 S.Ct. at 2795. Second, the court must consider whether the testimony assists the trier of fact in understanding the evidence or determining a fact in issue. This requirement is, in essence, a relevance inquiry. *Id.* at 591–93, 113 S.Ct. at 2796. The Supreme Court described the relevancy relationship between a scientific theory and facts in issue as one of "fit." *Id.* at 591, 113 S.Ct. at 2796 (*citing United States v. Downing,* 753 F.2d 1224, 1242 (3rd Cir.1985)).

■ "Under the first prong of *Daubert*, the district court must identify the basis of an expert's testimony and ascertain whether the methods, procedures, and information used by the expert to reach his or her conclusion are scientifically reliable." *Joiner*, 78 F.3d at 530–31. In the instant action, Dr. Brown has diagnosed plaintiff as having severe, adverse physical reactions to formaldehyde and phenol. Brown Aff. at 3. Additionally, he has diagnosed plaintiff as suffering from "long term effects of repetitive chemical exposures which occurred during her employment at Dow–UT" and resulted in her "developing multiple sensitivities to other antigens in her environment." *Id.* at 2. Defendants argue that Dr. Brown has, in effect, diagnosed plaintiff as having MCS and that his methodology for making such a diagnosis, as well as his methodology in establishing the cause of her illness and the appropriate course of treatment for her illness, is suspect at best. Defendants' concerns appear to stem primarily from Dr. Brown's association with "clinical ecology," a field that remains unrecognized by traditional professional organizations within the medical community. *See Bradley v. Brown*, 42 F.3d 434 (7th Cir.1994)(upholding the exclusion of clinical ecologist's testimony); *Summers v. Missouri Pacific R.R. Sys.*, 897 F.Supp. 533, 535 (E.D.Okla.1995) (excluding clinical ecologist's testimony and citing Manual on Scientific Evidence Federal Judicial Center at 73–74 (Federal Judicial Center 1994)).

"Clinical ecologists claim that various kinds of environmental insults may depress a person's immune system so that the exposed person develops a 'multiple chemical sensitivity,' that is, becomes hypersensitive to other chemicals and naturally occurring substances." *Summers*, 897 F.Supp. at 535 (quoting Manual on Scientific Evidence Federal Judicial Center at 73–74) (internal quotations omitted). In 1991, the American College of Occupational and Environmental Medicine (ACOEM) prepared a statement on MCS, finding that "[t]he pathophysiological mechanisms described by these practitioners do not in general conform to what is currently known of human biological functions" and, moreover, that "[t]he scientific foundation for managing patients with this syndrome has yet to be established by traditional clinical investigative activities that withstand critical peer review." *See id.* "To explain the phenomenon these practitioners draw on new or modified mechanisms such as total body load, spreading, or switching.' " *See id.* The ACOEM statement ultimately concluded that MCS "is presently an unproven hypothesis and current treatment methods represent an experimental methodology." *See id.* Other medical societies, such as the American College of Physicians,[4] the American Academy of Allergy and Immunology,[5] and the American Medical Association,[6] have joined the ACOEM's criticism of MCS and clinical ecology.

In response to defendants' motion, Dr. Brown attempts to distance himself from the field of clinical ecology as well as his apparent diagnosis of MCS.[7] With regard to the practice of clinical ecology, Dr. Brown states:

4. "Review of the clinical ecology literature provides inadequate support for the beliefs and practices of clinical ecology. The existence of an environmental illness as presented in clinical ecology theory must be questioned because of lack of a clinical definition. Diagnoses and treatments involve procedures of no proven efficacy." *Summers*, 897 F.Supp. at 536 (quoting American College of Physicians' Position Paper 1989); *see also* Forrester Dep., Defs.' Ex. 1.

5. The American Academy of Allergy and Immunology issued a position paper which reported that no scientific evidence supports the contention that MCS is a significant cause of disease or that the diagnostic tests or treatments used have any therapeutic value. *Id.; see also* Forrester Dep., Defs.' Ex. 2.

6. The American Medical Association's Council on Scientific Affairs concluded in 1992 that MCS "should not be considered a recognized clinical syndrome." The council based its conclusion on the findings that (1) "there are no well-controlled studies establishing a clear mechanism or cause for MCS" and (2) "there are no well-controlled studies providing confirmation of the efficacy of the diagnostic and therapeutic modalities relied on by those who practice clinical ecology." *Id.*

7. Interestingly, despite Dr. Brown's eschewal of clinical ecology, he readily acknowledges in his affidavit and on his Curriculum Vitae his membership in the American Academy of Environmental Medicine, which was originally called "The Society for Clinical Ecology." *See Summers*, 897 F.Supp. at 537.

[W]hile I believe that many of the concepts that clinical ecologists use are valid and helpful, I do not ... strictly adhere to all that they employ. My work is more eclectic. If something will work effectively and help patients, I use that, but the treatment that we're talking about here, and the diagnosis, doesn't have anything to do with clinical ecology.

Brown Dep. I at 181. He carefully phrased his diagnosis as "multiple sensitivities to other antigens in her environment," Brown. Aff. at 2, and when asked whether plaintiff has MCS, Dr. Brown qualified his previous diagnosis, declaring that "I wouldn't go so far as to say that it was just 'multiple' but she's allergic to many compounds that contain phenol and formaldehyde." Brown Dep. I. at 23. Nevertheless, Dr. Brown did borrow from the lexicon of clinical ecology when he described plaintiff's sensitivity to environmental antigens as a "spreading effect." *Id.* at 26–27. And apparently unable to explain the phenomenon of plaintiff's sensitivity to multiple chemicals, Dr. Brown stated "all I can say is that I test a person to these chemicals and they produce symptoms that I can produce and that I can relieve. Now, as to theories and explanations, enzyme construction, and all these, that's for scientists to discuss. I'm just a treating physician." *Id.* at 61–62. Despite Dr. Brown's protestations to the contrary, it appears that his diagnosis is, at least in part, one of MCS.

In the instant action, the court adopts the reasoning and conclusions of the *Bradley* and *Summers* courts, which found that "the 'science' of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a factfinder, jury or judge." *Summers,* 897 F.Supp. at 538 (quoting *Bradley v. Brown,* 852 F.Supp. 690, 700 (N.D.Ind.), *aff'd,* 42 F.3d 434 (7th Cir.1994)). Based on the rec-

ord, before it, the court is currently unable to conclude that MCS etiology and the clinical ecology surrounding it are scientifically reliable. Accordingly, the court finds inadmissible any evidence offered by Dr. Brown propounding a diagnosis of multiple chemical sensitivity, as well as any causes and treatments[8] grounded in the etiology of MCS and clinical ecology.

■ The court's finding with regard to MCS and clinical ecology notwithstanding, the court does not exclude all of Dr. Brown's testimony. First, as defendants themselves concede, Dr. Brown may testify in his capacity as plaintiff's treating physician. Moreover, Dr. Brown may also testify regarding plaintiff's chemical sensitivity to formaldehyde.[9] *Daubert* requires expert scientific testimony to be based on scientifically reliable methods, procedures and information used by the expert to reach his or her conclusions. Here, Dr. Brown has demonstrated that his diagnosis of plaintiff's allergy to formaldehyde is predicated on sound methodology.

Dr. Brown has testified that, in addition to an intracutaneous provocation test, he had sufficient information to conclude, with a reasonable degree of medical certainty, that plaintiff is hyperreactive when exposed to formaldehyde or products containing formaldehyde. Specifically, Dr. Brown bases his findings on his physical examination of the patient; the positive results of patch tests administered by Dr. Stewart, plaintiff's previous physician; the patient history as provided by plaintiff herself; and the results of the first skin tritation test. Brown Dep. II at 261–62. These diagnostic methodologies are scientifically valid, having been subjected to positive peer review and publication, and are considered reliable by medical specialists in the area of otolaryngic allergy.[10] *Id.* at

---

8. The parties fail to make it clear to what extent plaintiff's course of treatment, i.e., provocation-neutralization and Vitamin B–12 injections, are scientifically legitimate and supported by reliable methodology. The court cautions plaintiff that before she makes any proffer in this regard, she must be able to demonstrate that such a course in treatment is supported by scientifically valid principles, e.g., tested, subject to peer review, etc.

9. As the court in *Summers* pointed out, MCS is distinct from chemical sensitivity, "which involves a demonstrable reaction upon exposure to a single chemical, or small group of closely related chemicals." 897 F.Supp. at 540.

10. Dr. Brown holds a fellowship in the American Academy of Otolaryngic Allergy, which is the highest credential available, at present, for the

262–62; *see Summers,* 897 F.Supp. at 540 (indicating that scratch test, patch test or RAST test is sufficient to render an objective diagnosis of the generally accepted condition of chemical sensitivity). Accordingly, the court finds that Dr. Brown's bases for his opinion that plaintiff suffers from a sensitivity to formaldehyde,[11] as well as his methods and procedures, are sufficiently reliable to meet the requirements of *Daubert.*

Defendants also question the reliability of Dr. Brown's finding that white Epocast proximately caused plaintiff's adverse physical reactions while she was employed at Dow–UT. Defendants argue that Dr. Brown's conclusion is based only on speculation and subjective belief rather than on independent research, peer-reviewed scientific literature, treatises, etc. Defendants are particularly critical of Dr. Brown's failure to produce any published work which suggests that white Epocast or its components have ever caused or are even capable of causing the injuries plaintiff claims to have suffered. The court finds that while these criticisms may weigh against the credibility of Dr. Brown's findings, they do not necessarily undermine the reliability of his hypothesis.

As discussed above, Dr. Brown, using scientifically valid testing, has concluded that plaintiff is hyperreactive or allergic to formaldehyde. It is undisputed that plaintiff was working with white Epocast when she twice suffered severe, adverse physical reactions. Moreover, it is undisputed that Epocast contains formaldehyde; the Material Safety Data Sheet for Epocast indicates that phenol, formaldehyde, and formaldehyde polymers are found in Epocast A & B. *Id.* at 273–74. Based on his clinical evaluation of plaintiff, Dr. Brown has found the reactions suffered by plaintiff while she was working at

Dow–UT are consistent with an allergic reaction to formaldehyde. Brown Dep. II at 273–74. Dr. Brown has also indicated, even more specifically, that given his examination and testing of plaintiff, plaintiff's anaphylactic reactions are consistent with an exposure to formaldehyde. *Id.* at 274–76. In other words, based on plaintiff's medical history, Dr. Brown appears to have concluded that plaintiff was reactive to formaldehyde and phenol, and based on the fact that she was working with a polymer that contained both, there was, more likely than not, a causal connection between her exposure to such material and her adverse ·physical reactions.[12] *Id.* at 277–78.

Once a court has determined that an expert's scientific testimony is sufficiently reliable, the court must still make a determination as to the relevance of the testimony, i.e., whether the expert's opinions "fit" the facts of the case. In the instant action, defendants argue that Dr. Brown's causation analysis does not fit the facts of this particular case because his finding relies solely on the pure temporal coincidence of plaintiff's reaction and her work with white Epocast, and, consequently, it will not aid the jury in resolving a factual dispute. *See e.g., Schmaltz v. Norfolk & Western Ry. Co.,* 878 F.Supp. 1119 (N.D.Ill.1995) ("[I]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of Federal Rule of Evidence 702."). But as the court has taken great pains to explain above, Dr. Brown's analysis rests not only with the temporal coincidence *but also* with plaintiff's proven allergic/hyperreactive response to formaldehyde. The court finds this analysis sufficient to meet the relevance requirements found in Rule 702.

practice of the subspecialty of otolaryngic allergy.

**11.** Dr. Brown also contends plaintiff suffers from a sensitivity to phenol. Defendants assert, however, that there is no evidence that plaintiff is sensitive to phenol. Defs.' Letter Br. at 3. Obviously, any tests performed by Dr. Brown in this regard will be subject to the same analysis the court has already applied to Dr. Brown's findings concerning formaldehyde.

**12.** Because Dr. Brown has already established plaintiff's allergy to formaldehyde and established that formaldehyde is a component of white Epocast, making it unnecessary, if not unreasonable, for the defendants to suggest that Dr. Brown must perform a series of elaborate tests in order to demonstrate either Epocast caused plaintiff's sensitivity to formaldehyde or that plaintiff is "allergic" to white Epocast itself. The issue is whether the white Epocast caused plaintiff's three adverse reactions and not whether it caused the continuing condition of MCS.

In sum, the court finds that Dr. Brown's testimony regarding MCS, the treatment of MCS, and diagnoses and treatment modalities grounded in clinical ecology are lacking in scientific reliability and, therefore, must be ruled inadmissible. Dr. Brown may, however, testify as plaintiff's treating physician. In addition, he may offer testimony regarding plaintiff's sensitivity to formaldehyde and the probable cause of her adverse physical reactions from which she suffered during her employment with Dow–UT.

## II. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11.

### B. Workers' Compensation Claim

Pursuant to Ala.Code § 25–5–51 (1992), plaintiff brings a claim for workers' compensation benefits against Dow–UT. Plaintiff alleges that she has suffered personal injury caused by an accident arising out of and in the course of her employment, and, therefore, she is entitled to compensation. Defendants argue, however, that summary judg-

ment is due to be granted against plaintiff because she is unable to meet the special medical causation requirements imposed in the workers' compensation context.

 Alabama law requires a showing of medical causation before a claimant may recover workers' compensation benefits. In the instant action, in order for plaintiff to establish medical causation, she must present evidence that her exposure to workplace chemicals was a contributing cause to her injury. *See Ex parte Valdez,* 636 So.2d 401, 403 (Ala.1994) (holding that a hazard must not be a sole cause but may be a contributing cause); *see also Ex parte Price,* 555 So.2d 1060, 1062 (Ala.1989) (citing *Fordham v. Southern Phenix Textiles, Inc.,* 387 So.2d 204, 205 (Ala.Civ.App.1980)). "A mere showing of exposure ... will not necessarily compel a finding in favor of the plaintiffs on the issue of medical causation." *Valdez,* 636 So.2d at 405. Instead, when a court is "assessing the likelihood that a person was harmed by exposure to an agent," it must consider (1) the existence of a hazard, that is, the potential health effect of the hazard, (2) the exposure the person received, and (3) the level of risk associated with that exposure. *Id.* (quoting Kenneth R. Foster, David E. Bernstein, and Peter W. Huber, *A Scientific Perspective. in Phantom Risk: Scientific Inference and the Law* 1, 3 (Kenneth R. Foser et al. eds., 1993).

 In the instant action, the plaintiff has failed to produce any evidence of quantitative factors necessary to meet the stringent standards of medical causation in a workers' compensation action or, in the alternative, to explain why such stringent standards should not be applied in this action. Accordingly, the court finds that plaintiff has failed to create a triable issue as to medical causation and, therefore, that her workers' compensation claim is due to be dismissed.

## C. Fraud Claim

Plaintiff brings a claim of intentional and/or reckless fraud against individual defendants Rittenberry, Jones, and Vinson, and corporate defendant Dow–UT.[13] Plaintiff alleges that the individual defendants made statements assuring her that the protective gear and equipment she was furnished would be sufficient to protect her from any significant health risks associated with the materials with which she was working. Alternatively, plaintiff alleges that the statements made by the individual defendants were made recklessly and without knowledge as to whether the statements were true or false. In response, defendants argue (1) that plaintiff's fraud claims are barred by the exclusivity provisions of the Alabama Workers' Compensation Act and (2) that plaintiff does not have sufficient evidence to support her claims of fraud.

 The exclusivity provision of the Alabama Workers' Compensation Act states:

No employee of an employer subject to this article ... shall have any right to any other method, form or amount of compensation or damages for an injury ... occasioned by any accident proximately resulting from and while engaged in the actual performance of the duties of his employment and from a cause originating in such employment or determination thereof other than as provided in this article.

Ala.Code § 25–5–52 (1992). Defendants reason that because plaintiff's alleged injuries arose in the course of her employment, i.e., within the period of her employment, at the place where she would reasonably be and while she was fulfilling the duties of her employment or engaged in some incident to it, *see Massey v. United States Steel Corp.,* 264 Ala. 227, 86 So.2d 375, 378 (1955), her claims should be barred by the exclusivity

---

**13.** Plaintiff predicates her fraud claim against the corporate defendant Dow–UT on the basis of traditional agency principles. "A corporation is a legal entity, an artificial person, and can only act through agents." *Townsend Ford, Inc. v. Auto–Owners Ins. Co.,* 656 So.2d 360, 363 (Ala.1995)(citing *Warwick Development Co. v. GV Corp.,* 469 So.2d 1270, 1276 (Ala.1985). "Inasmuch as [the corporate defendant's employees] were acting as agents on behalf of the corporation and its business operations, their intent is the intent of the corporation." *Townsend,* 656 So.2d at 363. Because the court finds summary judgment is due to be granted in favor of all individual defendants, the court also finds that summary judgment is due to be granted in favor of Dow–UT as well.

provision. Defendants suggest that the only way for plaintiff's claims to fall outside the exclusivity provision is for plaintiff to bring a claim for a post-injury act which produces a second separate injury or loss. Defs.' Supp. Br. at 32–33.

The exclusivity provision, however, was "not designed to shield an employer or its insurer from the entire field of tort law." *Lowman v. Piedmont Executive Shirt Mfg. Co.*, 547 So.2d 90, 92 (Ala.1989). More to the point, "the Alabama Supreme Court has recognized that there exists a cause of action for *intentional fraud* that is not barred by the exclusivity provisions of the workers' compensation statute." *Crean v. Michelin Tire Corp.*, 889 F.Supp. 460, 463 (M.D.Ala.1995); *see also Gibson v. Southern Guaranty Ins. Co.*, 623 So.2d 1065, 1066 (Ala.1993). For instance, in *Namislo v. Akzo Chemicals, Inc.* *("Namislo I")*, 620 So.2d 573, 575 (Ala.1993), the Alabama Supreme Court allowed Mary Namislo to bring a claim of fraud against her former employer and her co-employees. Namislo claimed that she was exposed to harmful amounts of mercury and that her employer and co-employees fraudulently led her to believe that there was no risk should she become pregnant. *Id., see also, Namislo v. Akzo Chemicals, Inc. ("Namislo II")*, 671 So.2d 1380, 1388 (Ala.1995). The Alabama Supreme Court reiterated its decision in *Namislo II*, once again noting that "intentional torts have been recognized by [the] Court to fall outside the exclusivity provisions of the Workers' Compensation Act." 671 So.2d at 1388. Accordingly, the court finds that plaintiff's claims of intentional fraud and suppression are not barred by the exclusivity provision.

■ Although the Alabama Supreme Court has found intentional torts to be outside the purview of the exclusivity provision, the Court has also imposed a heightened

standard of proof to be applied in determining whether such a claim is to due to be presented to a jury. The *Lowman* court announced that:

> In order to insure against borderline or frivolous claims, we believe, in view of the exclusivity clause, that a plaintiff, in order to go to the jury on a claim, must make a stronger showing than that required by the "substantial evidence rule" as it applies to the establishment of jury issues in regard to tort claims generally. Therefore, we hold that in regard to a fraud claim against an employer, a fellow employee, or an employer's insurer, in order to present a claim to the jury, the plaintiff must present evidence that, if accepted and believed by the jury, would qualify as clear and convincing proof of fraud.

547 So.2d at 95. Accordingly, in her allegations of intentional fraud, plaintiff must present clear and convincing evidence, which if believed, would demonstrate that defendants intentionally or recklessly made a false representation concerning a material existing fact which was justifiably relied on by the plaintiff under the circumstances and which caused damage as a proximate consequence. Ala.Code § 6–5–101 (1993); *see also Namislo II*, 671 So.2d at 1388.

■ Notwithstanding the court's finding that plaintiff's claims of intentional fraud and suppression fall outside the exclusivity provision of the Workers' Compensation Act, the court is unable to conclude that reckless fraud or reckless suppression [14] falls outside the exclusivity provision. Although Alabama courts have consistently recognized that claims of intentional fraud and claims of *intentional* torts fall outside the exclusivity provision, they have not specifically addressed whether *reckless* fraud or suppression falls outside the provision.[15] Certainly,

14. Defendants correctly argue that "reckless suppression" is not a cognizable claim under Alabama state law. In an action for suppression it is not necessary to show intent to deceive; it is sufficient to show a breach of defendant's duty to disclose. *Baker v. Bennett*, 603 So.2d 928, 935 (Ala.1992). The defendant's state of mind at the time of the breach is not an element of the action. Thus, one cannot maintain separate claims for innocent, reckless, and intentional suppression. *See Henig Furs. Inc. v. J.C. Penney Co., Inc.*, 811 F.Supp. 1546, 1555–56 (M.D.Ala. 1993).

15. Although the parties address the issue of whether the exclusivity provision bars plaintiffs' claims of fraud and suppression, neither plaintiff nor defendants have addressed the narrower issue of whether *reckless* fraud is barred by the provision.

a credible argument could be made that where a claim of intentional fraud will lie, so must a claim of reckless fraud, for the Alabama Supreme Court has recognized that "when representations are made recklessly and heedlessly without any regard to their consequences, they will supply the necessary intent to support a fraud action." *Winn–Dixie Montgomery, Inc. v. Henderson,* 395 So.2d 475, 476 (Ala.1981).

■ However, as the court noted above, when the Alabama Supreme Court decided to recognize the intentional tortious conduct exception, it was particularly concerned about insuring against borderline or frivolous claims, so concerned that it imposed a heightened standard of proof in these types of claims. Moreover, as recently as last year, the Alabama Supreme Court indicated that the purpose of the legislature in amending the Alabama Workers' Compensation Act in 1985 was "to bar claims against co-employees and workers' compensation carriers based on negligence or wantonness." *Barron v. CNA Ins. Co.,* 678 So.2d 735, 737 (Ala.1996). Based on the supreme court's emphasis on *intentional* torts, its concern for border-line claims, its imposition of a heightened standard of proof, and its stated unwillingness to except claims sounding in negligence or wantonness, the court must conclude that Alabama law does not recognize reckless fraud as an exception to the exclusivity provision. Accordingly, the court finds that plaintiff's claims of reckless fraud and suppression must fail.

In response to plaintiff's intentional fraud claims, defendants contend that plaintiff has insufficient evidence to support those claims. First, they argue that plaintiff cannot show that the alleged representations were false or that they concerned a material existing fact because there is no evidence that white Epocast is the cause or source of Plaintiff's alleged reactions.[16] Second, defendants argue that by plaintiff's own admission, defendants

Rittenberry and Vinson did not make any statements to plaintiff upon which she relied to her detriment. Finally, defendants argue that it is undisputed that no one, including plaintiff, was aware that she could have a reaction or that white Epocast was capable of producing a reaction, and, consequently plaintiff is unable to produce clear and convincing evidence that defendants intended to deceive plaintiff.

### 1. *Margie Rittenberry*

■ Plaintiff acknowledges that Rittenberry did not make any specific assurances that she would sustain no further attacks while working in the bonding department. Pl.'s Dep. at 404–405. Nevertheless, plaintiff claims that after her first allergic reaction, Rittenberry instructed her to return to work in the Bonding Department, telling plaintiff that she had "checked with Wayne Jones and it [would] be all right for [plaintiff] to go back to work in Bonding." Pl.'s Aff. at 2, ¶ 5. Plaintiff contends that she understood Rittenberry's statement to mean that as long as she wore the personal protective equipment and clothing, that it was "safe" for her to return to work. *Id.* Pointing to the events that had preceded the statement, i.e., plaintiff's first allergic reaction and the doctor's instruction to stay away from the offending agent, plaintiff argues that the content and thrust of Rittenberry's message was fraudulent. Plaintiff also points out that Rittenberry's accident report shows that Rittenberry at least suspected white Epocast of causing plaintiff's allergic reaction and, consequently, must have been aware that plaintiff could have a reaction to it.[17] *See* Pl.'s Ex. C, "Supervisor's Accident Report."

In reviewing plaintiff's evidence, the court is unable to conclude that it rises to the level of clear and convincing evidence which, if believed, would indicate that Rittenberry made the statement with the intent to deceive plaintiff. On the contrary, the state-

---

**16.** Because the court has addressed this issue above and has found Dr. Brown's causation testimony admissible, the court finds it unnecessary to address this argument.

**17.** Despite her suspicions, Rittenberry told plaintiff that white Epocast, in its dry state, would not harm plaintiff. Pl.'s Tr. at 400. In light of the

fact that the Epocast Material Safety Data sheet states that the material is safe to handle and poses no environmental hazard, the court cannot conclude that such a representation can be characterized as intentionally false or even recklessly false.

ment appears to indicate that Rittenberry was concerned enough about the consequences of returning plaintiff to the Bonding Department that she felt the need to confer with Jones about the situation. And while ultimately the "assurance of safety" may have proven false, Rittenberry made it clear in her statement that she based her statement on her conference with Jones. Perhaps Rittenberry's reliance on Jones rises to the level of negligence or even recklessness, but it certainly does not rise to the level of an intentional misrepresentation. Accordingly, the court finds that summary judgment is due to be granted in favor of Rittenberry on the claim of intentional fraud.

### 2. *Wayne Jones*

██ Plaintiff alleges that after her first allergic reaction, Jones assured her that as long as she wore the protective equipment provided to her, she would be "all right." Pl.'s Dep. at 400. Claiming that Jones lacked any factual basis for making such a statement, plaintiff contends that Jones made the misrepresentation recklessly or intentionally and that she relied on it to her detriment. Although Jones does not dispute that he knew about plaintiff's first allergic reaction, he testified that he does not recall making this statement nor does he remember plaintiff informing him that the doctor had instructed her to stay away from the offending agent. Jones Dep. at 88, 122. He has also testified that although he did not request or review the plant doctor's report concerning plaintiff's first allergic reaction, he spoke with the plant nurse, who reported to him that plaintiff had suffered an allergic reaction and that she needed to wear her safety equipment. *Id.* at 87–88. Jones admits too that he did nothing in particular to determine what caused plaintiff's reaction. *Id.* at 93.

Jones' alleged statement is remarkably similar to that of the employer in *Namislo II.* 671 So.2d at 1389. Mary Namislo alleged that her supervisor had told her that "as long as we wore our proper protective equipment, there was nothing to worry about, we were not exposed to high enough levels, and that was it." *Id.* The Alabama Supreme Court concluded that without evidence that the supervisor knew at the time he made the repre-

sentation that Mary Namislo should not be working in her assigned department, the statement was insufficient evidence to support a claim of intentional fraud. In keeping with the *Namislo II* decision, the court is compelled in the instant action to find that although plaintiff has produced clear and convincing evidence that Jones acted negligently and/or recklessly, she has failed to present clear and convincing evidence that Jones knew at the time he made the representation that plaintiff should not be working in the bonding department area. Accordingly, the court finds that summary judgment is due to be granted in favor of Jones on the claim of intentional fraud.

### 3. *John Vinson*

██ Plaintiff alleges that during her 10–day evaluation with plant manager Vinson she discussed her concerns regarding her first adverse physical reaction and the plant doctor's order that she stay away from the offending agent. Pl.'s Aff. at 3. Plaintiff also alleges that during that meeting, Vinson assured her that if she would "do what [she had been] told to do" regarding the use of protective equipment that "the equipment [would] take care of [her]." *Id.* She alleges that Vinson sought to reassure her further by adding "I've been doing this a long time and I know what I'm talking about." *Id.* Like Jones, however, Vinson also does not recall discussing plaintiff's physical reaction with her or making the alleged statements to her. Vinson Dep. at 63–64, 110–11. Vinson admits that at the time of his conversation with plaintiff, he did not know that plaintiff was drilling electrical boxes nor did he know the principal ingredients of Epocast. *Id.* at 109, 121. He does not recall if he was ever advised about what protective clothing and safety gear she was using. *Id.* at 121–22.

The plaintiff most certainly has produced clear and convincing evidence to support a claim of negligent or reckless fraud, but in keeping with *Namislo II*, the court must again conclude that plaintiff has not presented clear and convincing evidence that Vinson knew at the time he made the alleged representations that plaintiff should not be working in the Bonding Department.

## D. *Suppression Claim*

In the instant action, plaintiff alleges that defendants intentionally and purposefully withheld and suppressed information related to plaintiff's personal health and safety. Specifically, she alleges that defendants withheld and suppressed product safety information from plaintiff as to the Epocast components; that they withheld and suppressed information relating to the proper use of safety clothing, gear and equipment; that they withheld and suppressed information dealing with the proper use of the hazardous materials being used by the plaintiff; and, more generally, that they withheld information, which was within their custody and control, concerning the effect the materials were known to have on persons. Plaintiff also alleges in her "alternative claims" that defendants withheld their lack of knowledge concerning the chemical properties with which she worked, the possibility of allergic or other adverse physical reactions, and the adequacy of the protection clothing and precautions.

In Alabama, a plaintiff alleging suppression must show that the defendant failed to reveal a material fact which it was obligated to communicate to the plaintiff. *Trio Broadcasters, Inc. v. Ward,* 495 So.2d 621, 623 (Ala.1986); *see also* Ala.Code §§ 6–5–102, 6–5–105 (1993). As with other types of fraud, a defendant's suppression must induce the plaintiff to act and the plaintiff must be damaged as a result. *First Alabama Bank v. First State Ins. Co.,* 899 F.2d 1045, 1056 (11th Cir.1990) (discussing Alabama law). "As a matter of law, one can only be liable for concealing facts of which one has knowledge." *Morris v. Merritt Oil Co.,* 686 So.2d 1139, 1145 (Ala.1996) (quoting *Brasher v. First Nat'l Bank of Birmingham,* 232 Ala. 340, 168 So. 42 (1936)). In the instant action, defendants argue that plaintiff is unable to show that white Epocast caused her injuries and consequently she is unable to show causation.[18] Alternatively, defendants argue that plaintiff has failed to adduce clear and

convincing evidence that the individual defendants suppressed any material fact.

Essentially, plaintiff contends that because defendants had access to the Material Safety Data Sheet on white Epocast and had more experience in the field, the defendants had superior knowledge concerning the potential hazards of white Epocast[19] and the proper safety equipment for working with white Epocast. *See* Pl.'s Dep. at 418–28. Certainly plaintiff has presented evidence that after plaintiff's first adverse reaction, Rittenberry *suspected* plaintiff might be having a reaction to white Epocast. Rittenberry completed the accident investigation form, stating that white Epocast was the suspected cause of plaintiff's reaction. *See* Pl.'s Br., Ex. C., Supervisor's Accident Investigation Form. Plaintiff has not produced any other evidence that either Vinson or Jones specifically suspected white Epocast caused plaintiff's reaction. Accordingly, the court must find that just as with her intentional fraud claim, plaintiff has failed to produce clear and convincing evidence that the individual defendants *knew* at the time they allegedly suppressed this information that white Epocast could cause an adverse reaction in plaintiff or that her safety equipment was inadequate. *See Morris,* 686 So.2d at 1144–45 (affirming granting of summary judgment on suppression claim where plaintiff failed to present credible evidence that defendants knew video game was illegal gambling device).

Plaintiff has cited no case law which would indicate that her alternative claims, i.e., that defendants had an obligation to inform her that they were unaware of the material with which plaintiff worked and of the necessary and proper safety equipment, are viable. As the court has already noted, one can only be liable for concealing facts of which one has knowledge. In the alternative claims, plaintiff is attempting to hold defendants liable for concealing the fact that they were without knowledge. Surely such an interpretation cannot be a tenable one. Accordingly, the

---

18. Because the court has addressed this issue above and has found Dr. Brown's causation testimony admissible, the court finds it unnecessary to address this argument.

19. The court notes that plaintiff has not produced any evidence that Material Safety Data Sheets were concealed from her.

court finds plaintiff's claims of suppression are due to be dismissed.

### E. Co–Employee Misconduct

■■■ Although the Alabama Workers' Compensation Act generally provides immunity to the employer, its compensation carrier, and its officers, directors, agents, servants, and employees, Alabama Code § 25–5–11(b) (1993) grants workers' compensation claimants a civil cause of action for injuries resulting from the "willful conduct" of their co-employees. See Reed v. Brunson, 527 So.2d 102, 108 (Ala.1988). In the last count of her complaint, plaintiff alleges that defendants Rittenberry, Jones and Vinson intentionally and purposefully failed to apprise the plaintiff of the health and safety risks which were involved in her use of white Epocast and other hazardous materials at the Dow–UT Montgomery plant. She also alleges that a reasonable person in the position of defendants would have known that her alleged injuries were likely to be a result of the actions they took. In response, defendants argue (1) that plaintiff is unable to establish that her exposure to white Epocast actually caused her injury[20] and (2) that plaintiff has failed to provide evidence that defendants acted willfully.

■■■ Section 25–5–11(c)(2) defines willful conduct as a "purpose or intent or design to injure another." In pursuing such a claim, "plaintiff need not show that the co-employee defendant specifically intended to injure the person who was injured." Reed, 527 So.2d at 119. Instead, plaintiff must show that "the co-employee defendant set out purposefully, intentionally, or by design to injure someone, and that his actions in furtherance of that purpose, intent, or design, resulted in, or proximately caused, the injury or death upon which suit was brought." Id.

■■■ Normally, intent is "a matter peculiarly within the province of the trier of facts." Pressley v. Wiltz, 565 So.2d 26, 27 (Ala.1990) (citing Walker v. Woodall, 288 Ala. 510, 262 So.2d 756 (1972)). However, for the issue of intent to go to the jury in the context of a co-employee willful conduct case, "the plaintiff must present at least some evidence tending to show either (1) the reason why the co-employee defendant would want to intentionally injure the plaintiff, or someone else, or (2) that a reasonable [person] in the position of the defendant would have known that a particular result (i.e., injury or death) was substantially certain to follow from his actions." Id. (quoting Turnbow v. Kustom Kreation Vans, 535 So.2d 132, 134 (Ala.1988)(internal quotations omitted)). If the plaintiff chooses to rely on the latter alternative, "evidence showing only a knowledge and appreciation of a risk of injury (short of substantial certainty that it will occur) will not entitle the plaintiff to a jury determination of whether the co-employee defendant acted with a purpose, intent, or design to injure another." Id. (quoting Turnbow, 535 So.2d at 134). This heavier burden is a result of the Legislature's recognition that negligent and wanton conduct is much more prevalent in the work place than conduct actually intended to cause injury or death, and, therefore, the burden "comports with the manifest intent of the Legislature that litigation among co-employees be restricted to those situations in which the plaintiff can show something more than what is usually sufficient to make out a case of negligence or wantonness." Reed, 527 So.2d at 120.

■■■ There is no evidence in this case to show that any of the defendants had a reason to injure the plaintiff or anyone else. Moreover, the evidence is insufficient to show that the plaintiff's injury was substantially certain to follow from the actions of the defendants. Plaintiff has presented evidence, in the form of her own testimony, that each of the individual defendants was aware of the plant doctor's orders that she be removed from whatever agent was causing her allergic reaction. While there is little doubt that this testimony establishes a genuine issue as to whether the individual defendants knew and appreciated the risk of injury if plaintiff were once again exposed to the offending agent, it is simply insufficient to establish willful, pur-

---

**20.** Because the court has addressed this issue above and has found Dr. Brown's causation testimony admissible, the court finds it unnecessary to address this argument.

poseful conduct.[21] *See e.g., Padgett v. Neptune Water Meter Co.,* 585 So.2d 900 (Ala. 1991) (holding that plaintiff failed to establish willful conduct where plaintiff alleged that supervisor required him to work in violation of his doctor's orders); *Layne v. Carr,* 631 So.2d 978 (Ala.1994) (holding that although coemployees may have perceived a risk of injury from accumulation of water in mine, such perception was insufficient to infer that they acted with a purpose to injure plaintiff). Accordingly, the court finds that although plaintiff has created a genuine issue as to whether defendants' conduct was negligent or even wanton, she has failed to make out a prima facie case of "willfulness" as defined in § 25–5–11(c)(1).

## CONCLUSION

Based on the foregoing, it is CONSIDERED and ORDERED that defendants' motion in limine be and the same is hereby GRANTED in part and DENIED in part.

It is further CONSIDERED and ORDERED that defendants' motion for summary judgment as to plaintiff's pendent state claims be and the same is hereby GRANTED.

The Clerk of the Court is directed to transmit the foregoing opinion and order to all parties by facsimile and United States mail.

---

**21.** As defendants point out, plaintiff's claims of willful conduct are further undermined by her own admission that defendants provided her with additional personal protective equipment and eventually relocated her to another department.