**James D. GABBARD, Plaintiff,**

v.

**LINN–BENTON HOUSING AUTHORITY,
Defendant.**

**Jan Wroncy, Plaintiff,**

v.

**Oregon Department of Transportation,
Defendant.**

**Civil Nos. 01–6316–TC, 99–6092–TC.**

United States District Court,
D. Oregon.

July 31, 2002.

Edward Johnson, Oregon Law Center, Portland, OR, Roy V. Smith, Legal Aid Services of Oregon Albany Regional Office, Albany, OR, Spencer M. Neal, Portland, OR, for plaintiff James D. Gabbard.

Katherine S. Somervell, Bullivant Houser Bailey, PC, Portland, OR, for defendant Linn Benton Housing Authority.

Jan Wroncy, Blachley, OR, pro se.

David A. Landrum Salem, OR, for defendant Oregon Department of Transportation.

### ORDER

COFFIN, United States Magistrate Judge.

In these two cases, the court is presented with the issue of whether a diagnosis of "multiple chemical sensitivity"[1] has a sufficient scientific basis to be presented to the factfinder by expert witnesses under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and, if so, whether a reasonable jury could find that either plaintiff has established that the respective defendants caused their injuries.[2] Presently before

---

1. Plaintiff Wroncy alleges her condition as MCS/porphyria. As these purported conditions are essentially identical, the court will refer to both multiple chemical sensitivity and porphyria as multiple chemical sensitivity or "MCS".

2. Because the issues presented are similar, and dispositive, the court has considered these cases together. The parties agreed at oral argument that expert witness statements and deposition testimony from any party could be used in either case; hence, statements from plaintiff Gabbard's expert could be used in support of plaintiff Wroncy's case, defendant ODOT's legal memoranda could be considered against plaintiff Gabbard, etc.

the court are defendant Linn–Benton Housing Authority's motion in limine to exclude evidence (# 22) [3] and defendant Oregon Department of Transportation's motion for summary judgment (# 53). For the reasons stated below, the defendants' motions are granted and the cases are dismissed.

## FACTUAL BACKGROUND [4]

Plaintiff James Gabbard is a resident of a Corvallis, Oregon apartment located in a complex managed by defendant Linn–Benton Housing Association. Shortly after securing his apartment, plaintiff Gabbard notified the manager that he suffered from multiple chemical sensitivity syndrome, which disables him, and requires that he avoid exposure to various chemicals. During plaintiff Gabbard's tenancy, defendant used some chemicals in and around his apartment, and plaintiff Gabbard asserts that such chemical use has caused him to suffer "bodily injury, such as stomach aches, head aches, nausea, vision problems and sleep loss." Amended Complaint (# 19) at 4. He contends that such use violates the Fair Housing Act, the Americans with Disabilities Act and the Rehabilitation Act.

Plaintiff Jan Wroncy is a resident of Blachly, Oregon, who also claims to suffer from multiple chemical sensitivity syndrome. She alleges that defendant Oregon Department of Transportation sprays chemical herbicides along its highways, and that those applications cause her to suffer disabling symptoms when she comes into contact with the areas so sprayed. She asserts that such use violates the Americans with Disabilities Act.

## STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1284 (9th Cir.1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens,* 533 F.2d 429, 432 (9th Cir.1976). The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valandingham v. Bojorquez,* 866 F.2d 1135, 1137 (9th Cir.1989). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Insurance Co. of North America,* 638 F.2d 136, 140 (9th Cir.1981).

Deference to the non-moving party does have some limit. The non-moving party "must set forth specific facts showing that there is a *genuine* issue for trial." Fed. R.Civ.P. 56(e) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, where

---

**3.** Because the motion in limine, if granted, would be dispositive of plaintiff Gabbard's claims, the court has treated it as a motion for summary judgment.

**4.** The facts presented are those that are undisputed or, if disputed, plaintiffs versions of the facts.

"the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## DISCUSSION

### I. *"Multiple Chemical Sensitivity" Syndrome and Daubert.*

District courts are charged with the task of evaluating scientific evidence for admissibility before a party can submit it to the factfinder for consideration.[5] For many decades, the courts were guided in their analyses of such evidence by the "general acceptance" test articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). This test instructed courts to exclude scientific evidence whenever its underlying scientific principles were not "sufficiently established to have gained general acceptance in the particular field in which [they

belong]." *Id.* at 1014. However, in 1993 the United States Supreme Court overturned this standard, holding that the adoption of the Federal Rules of Evidence had superceded *Frye. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 585–587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ Under *Daubert*, when faced with expert scientific testimony, a district court must[6] determine at the outset, pursuant to Fed.R.Evid. 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786.[7] By using such a standard, the court ensures that the evidence received is both relevant ("will assist the trier of fact") and reliable ("scientific knowledge"). Reliability is verified by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* at 592–593, 113 S.Ct. 2786.[8] Relevance is

5. Once, after a colleague asked him whether a certain scientific paper was wrong, physicist Wolfgang Pauli replied, "That paper isn't even good enough to be wrong." *See* Peter W. Huber, *Galileo's Revenge: Junk Science in the Courtroom* 54 (1991). To some extent, that capsulizes the role of the court in analyzing scientific evidence: regardless of whether individual scientists agree or disagree with a particular scientific theory, the proffered evidence must at least be "good enough", scientifically speaking, to warrant consideration by the factfinder.

6. *Daubert* instructs that the "gatekeeping" function of the court is not merely a power, but is an obligation. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786 ("The primary locus of this *obligation* is....") (emphasis supplied).

7. This standard comes from Fed.R.Evid. 702, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Court's reference to Rule 104(a) explains that in making this preliminary determination, district courts are not bound by the rules of evidence except those with respect to privilege, and need only be persuaded by a preponderance of the proof. *See* Fed.R.Evid. 104(a).

8. Several nondispositive factors should be considered when measuring the reliability of a particular scientific theory or technique: whether if (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. *Daubert*, 509 U.S. at 593–594, 113 S.Ct. 2786. In considering these factors, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786.

determined by ascertaining "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Id* at 593, 113 S.Ct. 2786.[9]

■ To the court's knowledge, no district court has ever found a diagnosis of multiple chemical sensitivity ("MCS") to be sufficiently reliable to pass muster under *Daubert*. *See, e.g., Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599 (10th Cir. 1997); *Frank v. State of New York*, 972 F.Supp. 130 (N.D.N.Y.1997); *Sanderson v. Int'l Flavors and Fragrances, Inc.*, 950 F.Supp. 981 (C.D.Cal.1996); *Carlin v. RFE Indus., Inc.*, 1995 WL 760739 (N.D.N.Y.1995); *Cavallo v. Star Enter.*, 100 F.3d 1150 (4th Cir.1996); *Bradley v. Brown*, 42 F.3d 434 (7th Cir.1994); *Brown v. Shalala*, 15 F.3d 97 (8th Cir.1994); *Coffin v. Orkin Exterminating Co.*, 20 F.Supp.2d 107 (D.Me.1998); *Coffey v. County of Hennepin*, 23 F.Supp.2d 1081 (D.Minn.1998); *Comber v. Prologue*, 2000 WL 1481300 (D.Md.2000). The cases cited by plaintiff Gabbard that have allowed testimony to reach the factfinder are not to the contrary; they either did not deal with the scientific validity of MCS under *Daubert* (*see, e.g., Whillock v. Delta Air Lines, Inc.*, 926 F.Supp. 1555 (N.D.Ga.1995)) [10] or excluded MCS testimony but allowed testimony on other issues and scientifically valid diagnoses (*see, e.g., Treadwell v. Dow–United Technologies*, 970 F.Supp. 974, 982 (M.D.Ala.1997)).[11] Plaintiff Gabbard's "case-by-case" approach, mentioned by some of these courts, is inapplicable here where the issue is whether or not evidence of MCS is admissible. Whether or not plaintiffs are "disabled" under the ADA or the Rehabilitation Act—which must be determined on a case-by-case basis—is not the focus of the inquiry; whether their treating physicians' diagnoses of MCS is admissible evidence is. As have all other courts which have considered the issue, the

9. In assessing relevance, "the district court must determine whether the methodology or reasoning underlying the expert opinion relates to the issue at hand, i.e., whether it assists the trier of fact in understanding the evidence or a fact in issue. In this regard, the *Daubert* Court discusses the concept of 'fitness,' that is, whether the expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Joiner v. General Elec. Co.*, 78 F.3d 524, 530 (11th Cir.1996) (internal quotation and citations omitted).

10. Holding that a jury question remained as to whether plaintiff was "disabled" under the ADA based on her symptoms, not a diagnosis of MCS.

11. "[T]he court adopts the reasoning of the *Bradley* and *Summers* courts, which found that 'the "science" of MCS's etiology has not progressed from the plausible, that is, the hypothetical, to knowledge capable of assisting a factfinder, jury or judge.' Based on the record before it, the court is currently unable to conclude that MCS etiology and the clinical ecology surrounding it are scientifically reliable. Accordingly, the court finds inadmissible any evidence offered by Dr. Brown propounding a diagnosis of multiple chemical sensitivity, as well as any causes and treatments grounded in the etiology of MCS and clinical ecology. The court's finding with regard to MCS and clinical ecology notwithstanding, the court does not exclude all of Dr. Brown's testimony. First, as defendants themselves concede, Dr. Brown may testify as plaintiff's treating physician. Moreover, Dr. Brown may also testify regarding plaintiff's chemical sensitivity to formaldehyde. *Daubert* requires expert scientific testimony to be based on scientifically reliable methods, procedures and information used by the expert to reach his or her conclusions. Here, Dr. Brown has demonstrated that his diagnosis of plaintiff's allergy to formaldehyde is predicated on sound methodology." *Id.* (citations omitted). The court also noted that "As the court in *Summers* pointed out, MCS is distinct from chemical sensitivity, 'which involves a demonstrable reaction upon exposure to a single chemical, or small group of closely related chemicals.'" *Id.*, n. 9 (citation omitted).

court finds that such evidence must be excluded.

As described above, *Daubert* recommended that courts consider four nondispositive factors in examining the admissibility of scientific evidence: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; and (4) has attained general acceptance in the pertinent scientific community. *Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786. Plaintiffs' proffered MCS evidence fails at each inquiry.

The first question is really the foundation for scientific inquiry in general: has a given theory been tested to show that, indeed, the hypothesized condition or relationship exists? In the instant case, the questions are: has there been testing done to verify that MCS is truly a valid medical condition, and if so, have the plaintiffs been tested sufficiently to demonstrate that they have it? The answer to both questions is clearly no. Even plaintiffs— and their expert physicians—admit that the existence of MCS as a condition is in the "testing" or "evolving" phase of its existence. Further, plaintiffs, who argue that testing for the condition in those suspected to have it would be unethical,[12] implicitly state that no significant testing has been done in general or on these plaintiffs in particular.[13] Defendants' expert, in his affidavit, goes further:

13. ... Drs. Dart and Heitsch [plaintiff Gabbard's physicians and experts] do not appear to conform with evi-

12. At oral argument, plaintiffs spent some time discussing why MCS testing was not feasible. Indeed, plaintiff Wroncy noted that "this is not Nazi Germany," referring, of course, to the horrible medical "experiments" conducted by Nazi physicians in the first half of the twentieth century, the discovery of which resulted in the adoption of the Nuremburg Code restricting the use of human subjects in medical research. However, in other areas of medicine, physicians and other medical researchers working under the Code have been able to test for, and thus provide support for or against, the existence and cause of a variety of conditions. Thus, rather than cut into the brain of every person who complains of a headache to see if they have a cancerous tumor, researchers have developed mechanisms that are less invasive and less dangerous to determine if such a tumor exists, including computerized axial tomography ("CAT") scans and magnetic resonance imaging ("MRIs"). Similarly, allergists can test individuals for allergic reactions to particular substances with the placement of small amounts of the substance on the patient's arm or back and inducing a small reaction, rather than soaking the patient in gallons of it and risking a life-threatening one. (This is distinct from the unproven and not generally accepted testing of MCS reactions, which use such minute doses as to call into question any observed effect). Researchers can also test for causal relationships by conducting studies on animals, such as those resulting in the ubiquitous "this product has been shown to cause cancer in laboratory rats." Plaintiffs have not convinced the court that medical science cannot develop similar testing procedures for the existence of MCS and, in the event that the condition actually exists, its causes. However, plaintiffs have themselves demonstrated that adequate testing has not been conducted.

13. Indeed, even plaintiff Gabbard's expert acknowledges: "Only gradually are enough cases [of a new purported disorder] collected to identify a pattern, then several investigators become aware of similar findings in other places and the overall pattern takes shape. Almost always, there follows a period of considerable skepticism and outright ridicule. A period of controversy follows this until either some brilliant sole [sic] makes a significant break through [sic], or the body of evidence in favor or against accumulates to an undeniable mass, and the new idea is accepted or rejected as obvious to all." Declaration of Richard Heitsch, M.D. (# 37) at 1. Implicit in his declaration is an admission that the MCS diagnosis is in the "skepticism and outright ridicule" phase, suggesting that the significant breakthrough (made through the sort of testing envisioned by *Daubert* ) has not yet occurred.

dence based medicine and thereby practice outside the usual bounds of science and medicine. They fail to use validated and accepted laboratory tests to aid in diagnosis and they also fail to use laboratory tests to follow-up their treatment modalities in order to determine the efficacies of their treatments.

14. MCS is not a condition recognized by evidence based practitioners of environmental medicine and this condition is not biologically plausible.

15. Claims of chemically-induced MCS are unproven, controversial, and not concordant with evidence based medicine.... MCS is a hypothetical syndrome, belief or theory that is outside of mainstream medical and scientific reliability. MCS has not achieved the status of general acceptance as a real entity which can be verified and effectively treated with approved medical therapies.

. . .

17. There is no consistent and reliable epidemiological data that supports the existence of an MCS condition.

. . .

35. ... Cause and effect associations are also subject to understanding all other factors which may in fact be responsible for the phenomenon and that co-exist with the hypothetical chemical association. Scientific disciplines, such as epidemiology, biology, immunology, toxicology, pharmacology, and the various medical specialties, are all predicated on these criteria. The proponents of MCS ignore these essential criteria. They, in fact, have no scientific basis for the existence of MCS and proponents of MCS are no different than many other trends or cults that have existed over time who have also attempted to insert novel and unique theories into medicine and science. MCS is no different than any of a variety of "medical fads" which have surfaced throughout history—fads, such as blood letting with leaches or diagnosing disorders by feeling the bumps on one's head, which come and go because they are never validated with scientific evidence based upon the objective criteria of the scientific method.

Declaration of Raymond D. Harbison, M.S., Ph.D. (# 30).

The court is convinced through its own examination of the materials provided by the parties and by the analysis of Dr. Harbison that neither significant testing of MCS as an actual condition nor adequate testing of either plaintiff to determine if they have such condition has been completed.[14] Thus, the first *Daubert* question must be answered in the negative.

The second question *Daubert* instructs courts to ask is whether the scientific evidence in question has been subject to peer review and publication. Although a closer question, the answer must again be no.

Although a great deal has been written about MCS,[15] such writing generally does

**14.** Dr. Heitsch informs the court that testing is underway at a number of universities and hospitals. When such testing is completed, perhaps the answer to the first *Daubert* inquiry will be different; certainly the results of such testing will help future litigants and courts when dealing with MCS issues. That such testing is presently ongoing, however, does not help plaintiffs here. Law lags science; it does not lead it.

**15.** *See, e.g.,* Declaration of Richard Heitsch (# 37), Ex. 1.

not constitute the "publication" of research contemplated by *Daubert*. Of the scholarly articles which have been peer-reviewed and which discuss MCS as a condition, most, if not all, are anecdotal rather than quantitative, and do not provide scientific support for the existence of the condition. Many of the articles are more properly characterized as advocacy pieces, attempting to persuade clinicians that MCS is a possible diagnosis when other (i.e. testable) conditions have been ruled out. None of them, as far as the court can tell, provide methodologically sound, quantitative research support for the proposition that MCS is a valid diagnosis.[16] It is the publication of this sort of research—basic research, using accepted research techniques, providing scientific (as opposed to anecdotal) evidence of MCS—to which the *Daubert* inquiry is directed. On this question, Dr. Harbison notes:

> 13. ... Drs. Dart and Heitsch have failed to follow any scientific method in arriving at their conclusions. Instead they have put forth novel and unique hypotheses that have not been previously reported in the scientific and medical literature.
>
> ...
>
> 15. ... Various scientific and medical associations, as well as researchers, have investigated the claims of MCS. MCS is unproven and there has not been sufficient peer reviewed scientific and medical literature to support the validity of this condition.
>
> ...
>
> 17. ... Further, there is no reliable scientific and medical literature that documents that latex caulk and

Round Up, as used at the Linn–Benton Housing Authority facility at which Mr. Gabbard resided, can cause the extreme fatigue, respiratory problems, tinnitus, gastric distress and skin reactions described by Mr. Gabbard.... No MCS study has provided the required level of epidemiological proof to establish a cause and effect relationship.

> ...
>
> 22. ... The treatment methods employed by MCS have not been shown to be effective. The techniques ... have been shown to be unreliable.... The treatment studies have been criticized for unexplained loss of subjects, lack of testing for known allergens and a high placebo response rate. Their reproducibility and validity are questionable. Studies have found that MCS subjects could not discriminate between a placebo such as pure air or saline (salt water) and the purported offending environmental chemical ...
>
> ...
>
> 29. The rejection of clinical ecological illness and MCS by [various] medical organizations was based upon: (1) The lack of any controlled studies concerning either the diagnosis or treatment methods ...

Declaration of Raymond D. Harbison (# 30).

Examination of published MCS studies—and lack thereof—has convinced the court that the existing literature on the subject does not constitute the "publica-

---

**16.** As mentioned previously, most of the studies that suggest MCS as a diagnosis deal with it as a diagnosis of exclusion; i.e., when all else is excluded, maybe a patient has MCS. Those few studies which do purport to ana-

lyze the diagnosis and treatment of MCS quantitatively have employed suspect methodology. *See*, Declaration of Raymond Harbison (# 30) at ¶¶ 21, 22.

tion" of research for purposes of the *Daubert* inquiry. Thus, the second *Daubert* question must also be answered in the negative.

*Daubert* next advises the court to inquire whether the evidence offered has a "known or potential rate of error." *Daubert*, 509 U.S at 594, 113 S.Ct. 2786. This inquiry is directed at the "scientific technique[s]" employed by a scientist (or physician) to reach a conclusion. As articulated by Dr. Paul Dart (plaintiff Gabbard's physician), plaintiff Gabbard has undergone "informal" [17] "avoidance and challenge" [18] testing.[19] Such informal testing has no known or potential rate of error. Indeed, the informal nature of the testing here would defeat any claim to the contrary, as a rate of error established in a controlled environment [20] would not necessarily translate into testing conducted in the home. Dr. Dart implicitly concedes as much: "Avoidance and challenge testing, *done in a controlled setting* has quite a low error rate. This is fairly straightforward, although it isn't blinded testing from the patient's point of view." Declaration of Paul Dart, M.D (# 36) at 4 (emphasis supplied).[21]

The diagnostic techniques used by plaintiffs does not have a known rate of error.

The third *Daubert* question must be answered in the negative.

The final factor for courts to consider described by *Daubert* is whether the proffered evidence has attained general acceptance in the scientific community. The court is persuaded that evidence of MCS has not attained such acceptance.

As described above, MCS is not a complete unknown in the scientific community. There is a great deal of lay literature on the subject, as well as anecdotal and, to a degree, quantitative research publications.[22] Many, even most, physicians probably know that some doctors and researchers promote MCS as a valid diagnosis for some patients when no other appropriate diagnosis can be made. However, knowledge of a diagnosis is not acceptance of it.[23]

Dr. Dart asserts that many doctors subscribe to the validity of MCS. He states that:

> By 1994 the [American Academy of Environmental Medicine (previously the Society for Clinical Ecology)] had 570 members.... The [American Academy of Otolaryngic Allergy] had about 2000 members. The [Pan–American Allergy Society] had about 550 members.

---

**17.** Conducted in his home.

**18.** Whereby the patient self-reports symptoms suffered, along with what stimuli he believes he was exposed to at or near the onset of the symptoms, and then seeks to avoid such stimuli to see if the symptoms improve. Such testing can also be done with an initial effort to remove potential stimuli, and reintroducing them one by one until a reaction is reported.

**19.** Plaintiff Wroncy has apparently used a similar diagnostic tool.

**20.** Dr. Dart suggests an "environmental control unit" might present an appropriate such controlled environment, although Dr. Harbison disagrees (Supplemental Declaration of Raymond Harbison (# 42) at 8).

**21.** Dr. Dart admits that the plaintiff Gabbard's tests were not conducted in a controlled environment such as an environmental control unit, apparently due to cost considerations. Declaration of Paul Dart (# 36) at 3.

**22.** Although the quantitative studies are of questionable validity. *See supra.*

**23.** *See Daubert*, 509 U.S. at 594, 113 S.Ct. 2786: "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." (citation omitted).

The American Academy of Allergy and Immunology, which is quite critical of clinical ecology, had about 5000 members in 1994, some of whom were also members of the other organizations listed above.

So, although "orthodox" allergists antagonistic to the concepts put forward by clinical ecology or environmental medicine dominate the academic and research institutions in our country, the raw numbers show a ratio of at least 2 or 3 members of the "unorthodox" allergy societies for every 5 members of the "orthodox" allergy society.

From this perspective, the controversy over clinical ecology looks like a difference of opinion within the medical profession brought on by new ideas, rather than an aberration created by a few fringe practitioners.

Declaration of Paul Dart (# 36) at Ex. 1, p. 6. This is contrasted with Dr. Harbison's statements:

26. The theory of the so-called "multiple chemical sensitivity syndrome" (MCS) is derived from a controversial practice previously known as "clinical ecology".... Both the practice of "clinical ecology" and the theory of "multiple chemical sensitivity syndrome" have been rejected by the vast majority of the medical and scientific community.... There is scientific evidence that this "syndrome" is not a real clinical entity ...

. . .

29. The rejection of clinical ecological illness and MCS by [various] medical organizations was based upon: (1) The lack of any controlled studies concerning either the diagnosis or treatment methods; (2) The lack of any scientific proof for a cause and effect relationship between chemical exposure and the symptoms diagnosed by [sic] as "multiple chemical sensitivity" or "environmental illness"; (3) The lack of any clinical definition of the symptoms of "multiple chemical sensitivity" ... and (4) the absence of objective signs in many of the patients diagnosed as chemically sensitive. Thus, the medical and scientific communities have clearly rejected the theories of a "multiple chemical sensitivity syndrome."

Declaration of Raymond Harbison (# 30).[24]

Upon review of the competing expert's claims, and of the materials provided in support, the court agrees with Dr. Harbison that MCS has not attained general acceptance. MCS appears to the court to be outside the "mainstream" of medical practice, with a relatively small number of physicians actively employing it as a diagnosis. As noted above, there appears to be a number of MCS-related research projects underway, and there may come a point in time where, as a result of such research, more physicians subscribe to the MCS theory. However, it cannot be said that at present, MCS is a "generally accepted" diagnosis. The answer to *Daubert's* fourth question is no.

Although *Daubert* instructs that none of these four factors are dispositive, the fact that plaintiffs' proffered evidence fails each one is troubling. After examining the evidence as a whole, and with due consideration of the four *Daubert* factors, the court is convinced that plaintiffs' MCS-related evidence is not sufficiently reliable to allow it to be considered by a factfinder.

24. In these sections and others, Dr. Harbison cites to numerous studies, reports and position papers to support his general statement that the medical and scientific communities have rejected MCS.

## II. *Causation.*

■ Separate from the question of whether MCS evidence is admissible, the issue arises whether a reasonable factfinder could find that defendants' use of certain specified chemicals caused plaintiffs' injuries. Even assuming, *arguendo*, that evidence of MCS was admissible, the court finds that a reasonable factfinder could not find such a causal link.

As touched upon in the above *Daubert* analysis, one of the difficulties with the MCS diagnosis shared by plaintiffs is the breadth of its scope. The list of chemicals which are reputed to cause a reaction in MCS patients generally—and plaintiffs here specifically—is lengthy, to say the least. Dr. Dart, plaintiff Gabbard's physician, wrote the following in a letter to a disability analyst:

> Mr. Gabbard is not going to be able to tolerate work settings that expose him to even low levels of many noxious vapors, including: fragrances from perfumes, aftershaves, colognes, deodorants, scented soaps and shampoos, scented laundry detergents and fabric softeners; solvent and fragrance fumes from many cleaning compounds; fumes from xerox machines and laser printers, NCR paper, and "white out" solution; chemical "air fresheners"; off-gassings from synthetic carpets and other fabrics, foam, or particle board; fumes from recently applied paints and glues; fumes from combustion products of natural gas, automobile gasoline, diesel oil; solvent fumes from marking pens and from some printer inks; hot oil vapors produced by some small machines such as

fans and electric typewriters; fumes from new vinyls and plastics (including new computer hardware); pesticide and herbicide residues; tobacco smoke.

Declaration of Paul Dart (# 36) at Ex. 2, p. 1. Dr. William Morton sent three lists of potentially irritating chemicals on behalf of plaintiff Wroncy; one of which, entitled "Environmental Porphyrogenic Materials", listed the following:

> Paint fumes, particularly epoxies[;]
>
> Metal dusts and fumes[;]
>
> Arsenic[;]
>
> Vinyl chloride fumes and dusts[;]
>
> Alcohols, particularly ethanol[;]
>
> Glycols, glycol ethers[;]
>
> Freons[;]
>
> Polychlorinated biphenyls (PCBs)[;]
>
> Tetrochloro dibenzodioxins (TCDDs)[;]
>
> Chlorophenoxy acetic acid herbicides[;]
>
> Hexachlorobenzene[;]
>
> Formaldehyde, other aldehydes[;]
>
> Heavy vehicle exhaust fumes[;]
>
> Perfumes, other fragrances[;]
>
> Chlorine, chlorinated cleaning agents[;]
>
> Possibly any chlorinated hydrocarbon[;]
>
> *Anything* that triggers porphyria symptoms[.] (emphasis supplied)

*See* Defendant ODOT's Motion for Summary Judgment (# 53), at Ex. 1 p. 15.[25] Thus, their own physicians state that plaintiffs could suffer a reaction to any of a number of chemicals that are in common use. Given this, a reasonable jury could only speculate that plaintiffs' suffering was caused by defendants' use of herbicides or latex caulk. Who is to say, for example,

---

**25.** The third list submitted by Dr. Morton consisted of six pages from a brochure entitled "Porphyrinogenic Substances" that he felt were particularly relevant. In these six pages of what appears to be a brochure of at least 75 pages (the final page Dr. Morton provided was page 75, which started the "T"s), 256 chemicals are listed. By extrapolation, even if page 75 was the brochure's last page (an unlikely proposition, given that page 75 merely starts the "T"s in an alphabetical catalogue of chemicals), the brochure would list 3200 chemicals as "porphyrinogenic substances."

that it was not tobacco smoke from an adjacent apartment that triggered a reaction in Gabbard, or diesel fumes from the highway that caused Wroncy's injuries? [26]

An examination of the medical records provided by plaintiff Gabbard, for example, reveals the difficult and speculative nature of attempting to pinpoint the causes of his symptoms: on February 25, 2002, he presented himself to the VA Medical Center in Portland Oregon, complaining of fatigue, lethargy, malaise, bad taste, and tongue numbness, which he associated with exposure to the grayish contents of a bag on a vacuum cleaner he had recently purchased at a junk yard. Medical staff, however, were unable to determine or verify that the patient's reported symptoms were caused by such exposure. *See* Declaration of James Gabbard (# 38), Ex. 1.

The unfairness of subjecting defendants to civil rights and torts liability based on subjective self-diagnosis which is beyond the pale of scientific or otherwise reliable validation is readily apparent. The cases against the Housing Authority and ODOT have no more evidentiary support than the case against the contents of the vacuum cleaner bag. They are all far too speculative and unprovable to support a finding of liability.

Because plaintiffs cannot sufficiently establish a causal link between defendants' actions and their injuries, their cases cannot stand.

### CONCLUSION

Because it lacks reliability, evidence of multiple chemical sensitivity syndrome cannot be used in support of plaintiffs' cases. Further, a reasonable factfinder could not find that defendants' use of particular chemicals was the cause of plaintiffs' injuries. Defendant Linn–Benton Housing Authority's motion in limine to exclude evidence (# 22) [27] and defendant Oregon Department of Transportation's motion for summary judgment (# 53) are therefore granted. Because the motions are dispositive of plaintiffs' cases, these cases are dismissed. All remaining pending motions are denied as moot.

**26.** Plaintiffs noted at oral argument that they could rely on "circumstantial evidence" that it was defendants that caused their injuries; specifically, their personal testimony that they suffered their injuries contemporaneously with defendants' use of the purportedly offending chemicals. However, such testimony alone is insufficient to allow a reasonable factfinder to find such a causal link when plaintiffs' own experts agree that a myriad of other chemicals could have caused the reactions, and plaintiffs could have simultaneously been exposed to any number of them. Using the traditional language of tort law: plaintiffs cannot show that "but for" defendants use of herbicides and latex caulk they would have been free from injury, nor can they show that such use was a "substantial factor" in causing their injuries. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 41 (5th ed. 1984) ("The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it") ("[I]n the great majority of cases, [the substantial factor test] produces the same legal conclusion as the but-for test.... [N]o [relevant] case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it").

**27.** Treated here as a motion for summary judgment.